[Cite as *In re A.S.*, 2011-Ohio-982.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | : | JUDGES: |
| | : | W. Scott Gwin, P.J. |
| | : | John W. Wise, J. |
| A.S. & R.S., Jr. | : | Julie A. Edwards, J. |
| | : | |
| | : | Case Nos. 10-CA-121 & 10-CA-127 |
| | : | |
| | : | |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING:         Civil Appeal from Licking County
                                 Court of Common Pleas, Juvenile
                                 Division, Case Nos. F2009-0142 &
                                 F2009-0143

JUDGMENT:                        Affirmed

DATE OF JUDGMENT ENTRY:          March 2, 2011

APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant -
                                          R.S.

KENNETH W. OSWALT                         THOMAS S. GORDON
Licking County Prosecutor                 P.O. Box 314
20 S. Second Street                       Pickerington, Ohio  43147
Newark, Ohio  43055
                                          For Defendant-Appellant –
                                          Elsie Smith

                                          FELICE HOWARD
                                          Howard Legal LLC
                                          118 Graceland Blvd., #150
                                          Columbus, Ohio  43214

*Edwards, J.*

{¶1} Appellants, Elsie S. and Richard S., appeal from the October 19, 2010, Judgment Entry of the Licking County Court of Common Pleas, Juvenile Division, denying their objections to the Magistrate's Decision, terminating their parental rights and granting permanent custody of A.S. and R.S., Jr. to Licking County Department of Job and Family Services.

STATEMENT OF THE FACTS AND CASE

{¶2} A.S. (DOB 3/31/07) and R.S., Jr. (DOB 4/27/05) are the biological children of appellants Elsie and Richard S. On March 2, 2009, Licking County Department of Job and Family Services (LCDJFS) filed complaints alleging that the children were dependent children. At such time, concerns were the unemployment of the parents, the unhealthy and unsanitary living conditions in the home, the fact that many individuals with criminal records were living in the home to help pay the rent and appellant Elsie S.'s substance abuse problems. One of the individuals had, on February 28, 2010, during an altercation with appellant Elsie S., who was intoxicated, stabbed himself. As a result, the police were called. On March 2, 2009, the trial court held an emergency shelter care hearing and granted emergency custody of the children to LCDJFS.

{¶3} Pursuant to a Judgment Entry filed on June 8, 2009, the children were adjudicated dependent and temporary custody was granted to LCDJFS.

{¶4} On January 25, 2010, LCDJFS filed a Motion for Permanent Custody of both children pursuant to R.C. 2151.413(A). A hearing on such motion was held on

June 21, 2010 and continued on July 14, 2010. The following testimony was adduced at the hearing.

{¶5} Cynthia Marie Lewis testified that on April 17, 2010 at between 2:30 a.m. and 3:00 a.m., she observed appellant Elsie S. banging on the door of a developmentally disabled young man who lived in the apartment below Lewis. Lewis testified that appellant Elsie S. was screaming at the man to open the door, that she threatened him and that "[s]he was trying to stand up and she'd just fall right back down." Transcript of June 21, 2010 hearing at 7. The man, George Davenport, testified that he knew appellant Elsie S. when he was hanging out with her ex-husband and that appellant Elsie S. wanted to sell him a game system. According to Davenport, appellant Elsie S. called his phone "cussing" at him and then came to his door and started banging on it while cussing at him." Transcript of June 21, 2010 hearing at 15. As a result, the police were called. Davenport testified that a week or two week before the hearing, appellant Elsie S. said that there was going to be trouble if her kids were taken away. She did not say what the trouble was.

{¶6} Officer Jon Purtee of the Newark Police Department testified that he investigated the altercation on April 17, 2010 and that when he spoke with appellant Elsie S., she was extremely intoxicated and refused to stay inside her apartment the rest of the evening and not go over to Davenport's. Appellant Elsie S. was then arrested for disorderly with intoxication and menacing and was convicted on June 14, 2010.

{¶7} The next witness to testify at the hearing was Mark Miller who was, at the time of the hearing, appellant Elsie S.'s landlord. Miller previously was the landlord for both appellants. Miller testified that at one point, he hired appellant Elsie S. to do work

on some of his rentals to work off some of her rent. Miller testified that between August of 2009 and March of 2010, appellant Elsie S. worked about 20 hours a month in the winter and 35 to 40 in the summer for about $8.00 an hour that he credited to her rent. Miller testified that he believed that appellant Elsie S. was working at McDonald's and he testified that she paid rent in the amount of $350.00 a month.  Miller testified that appellant Elsie S. owed him $200.00 for the month of May and for the whole month of June.

{¶8}  Appellant Richard S. testified that he has a total of four children. He testified that his oldest child, a daughter, was eleven years old and lived with her mother. Richard S. testified that he could see his daughter whenever he wanted and had seen her the week before. Richard S. testified that his second oldest child, a son named Zachary who was five years old, was adopted after Job and Family Services took him away from his mother. Appellant Richard S. testified that he and appellant Elsie S. had tried to get custody of Zachary over four years earlier, but were not approved because he did not have enough income at the time.

{¶9}  Appellant Richard S. testified that he married appellant Elsie S. on September 10, 2005 and that he thought that appellant Elsie S. was a good mother. Appellant Elsie S. filed for divorce in January of 2010 and the divorce became final on May 26, 2010.

{¶10}  The following is an excerpt from appellant R.S.'s testimony:

{¶11}  "Q. Did you notice any mental health issues regarding R.S. and A.S. when you had custody of them?

{¶12}  "A. [A.S.], yes.

{¶13} "Q. Tell me about those.

{¶14} "A. With her having albino her – albinism, her eyes, like, shifted a lot.

{¶15} "Q. Okay.

{¶16} "A. And we was getting ready to start looking for a doctor for [A.S.], that's when – after – we was talking about doing it when we was together but, then we separated. Then right before me and Elsie started getting back together, that's when Job and Family Services stepped in and took her out of the house.

{¶17} "Q. Okay. When did you first – well, you first noticed she was an albino child when she was born, right?

{¶18} "A. Yes.

{¶19} "Q. Okay. And when did you first notice her eyes were shifting in an unusual way?

{¶20} "A. when she started getting older --

{¶21} "Q. When she started getting older --

{¶22} "A. – Okay.

{¶23} "Q. About when would that have been?

{¶24} "A. She really didn't start showing it very much. When she was six months, we started seeing her eyes shift a lot. We didn't really start noticing it more until she was a year old.

{¶25} "Q. Okay. And you say 'we', you're talking about you and Elsie?

{¶26} "A. Yes.

{¶27} "Q. Okay. And when did you first take her to a doctor about these concerns?

**{¶28}** "A. About the albinism, Elsie looked it up on the computer about it.  And we was looking for a doctor out there in Coshocton County for her shots and everything, which every time that we called about scheduling for the shots, they always made it where it was longer for us to go in there to see him to get the shots for her.

**{¶29}** "Q. Okay.  So, it's fair to say, then, that up through February 28th of 2009, you and Elsie never really got any treatment for [A.S.] about this?

**{¶30}** "We was … looking into it when - - because me and her separated." Transcript of June 21, 2010 hearing at 34-35.

**{¶31}** When questioned whether he noticed any developmental delays in either of the children, appellant Richard S. testified that A.S. was slow in talking and walking and that he and appellant Elsie S. had arranged for checkups on her by Help Me Grow. He testified that he did not notice any dental problems with the children right away and that after he and appellant Elsie S. separated and LCDJFS became involved, it was brought to his attention that R.S., Jr. had significant dental issues.

**{¶32}** Appellant Richard S. testified that he was not working and had not worked since 2005, but was looking for work. He testified that he and his current wife had started looking for work the beginning of May of 2010. Appellant Richard S. testified that he paid $510.00 a month for an apartment using the $674.00 a month that he received in Social Security for a learning disability. He testified that he could not read, write or spell and that he and his wife also received food stamps.  The apartment in which he resided with his wife was a one bedroom apartment with a futon in the living room.  He testified that they were planning on moving to a larger apartment.

{¶33} Appellant Richard S. was questioned about the February 9, 2009, incident that resulted in Children's Services becoming involved. He testified that he was convicted of child endangering and had been off of probation since March 22, 2010. Appellant R.S. also has prior convictions for grand theft auto in 1999, corruption of a minor in 1999, destruction of private property in 2003, shoplifting in 2003 and receiving stolen property in 2009. He testified that he had not received counseling for domestic violence or anger management issues because Licking Alcohol Prevention Program (LAPP) said that he did not need their services. Appellant Richard S. further testified that although, after completing a three day parenting class, it was recommended that he complete a longer program, he did not. He admitted that he fell asleep in the parenting classes when he was attempting to get custody of Zachary.

{¶34} Testimony was adduced at the hearing that appellant Richard S. married his current wife on May 4, 2010 after dating her for two months. He further testified that he earned money by selling abandoned scrap metal to junkyards.

{¶35} At the hearing, appellant Elsie S. testified that the children should be placed with her because her ex-husband's situation was not stable due to his recent marriage and his small apartment. She admitted that she was convicted in 2003 of selling or furnishing alcohol to an underage person, that in 2008 she was convicted of menacing due to a dispute with a neighbor, and that in August of 2009 she was convicted of reckless operation.

{¶36} The following testimony was adduced when appellant Elsie S. was questioned about the February 9, 2010 incident that resulted in the complaints in this case being filed:

{¶37} "A. I was at the bar, I came home, and everything kind of went crazy because I found out that the kids were being involved in a situation they shouldn't have been.  There was drinking at the house.  It was a party going on when it shouldn't have been.

{¶38} "Q. Somebody got stabbed and we didn't know if that person --

{¶39} "A. No, nobody --

{¶40} "Q. -- was going to come back?

{¶41} "A. -- got stabbed.

{¶42} "Q. Wasn't there some blood?

{¶43} "A. He -- this ex-boyfriend of mine came at me and then went outside and proceeded to stab himself and then leave the house, yeah.

{¶44} "Q. So, he was a little out of control?

{¶45} "A. yeah, he was -- he came at me because I was yelling, like, you need to get out of my house and -- it was just a really bad situation.  I've been working for a long time to make sure that nothing like that ever happens again."  Transcript of June 21, 2010 hearing at 76-77.  As a result of the incident, she was charged with resisting arrest, disorderly conduct and child endangering on February 28, 2009, and was placed on Diversion under the condition that she comply with her case plan.

{¶46} Appellant Elsie S. testified that she signed a case plan in June of 2009 with Candell Looman and that she believed that she had successfully worked on the same. She testified that she was going to LAPP once a month, had been working at McDonald's for about three months and had completed a three day parenting class. While it was recommended by LAPP that she attend a group that meets three times a

week, appellant Elsie S. testified that she worked too much overtime and could not attend. She testified that she was never referred to a parenting program that required 90 days of sobriety before she could attend. Appellant Elsie S. testified that she was clean from November of 2009 until April of 2010.

{¶47} At the hearing, appellant Elsie S. testified that she had been living in the same two bedroom place for a year. She testified that an old boyfriend, who was a registered sex offender, had listed her address when he registered as a sex offender and that she broke it off with him in November or December of 2009 after her caseworker told her that if she continued dating him, she would lose her children. Appellant Elsie S. denied knowing about the man's criminal past when she was dating him and denied that he had ever lived with her even though a neighbor of hers testified at the hearing that he did. She testified that she made about $500.00 every two weeks and paid $350.00 month in rent. Appellant Elsie S. further testified that she paid about $100.00 a month in court fines, $35.00 a month in electric and that she went to a food pantry. She admitted that on August 20, 2009 and October 9, 2009, she tested positive for marijuana, that on October 22, 2009, she tested positive for marijuana, meth and amphetamines. She also testified that she was fired from Wendy's in the fall of 2009 because of attendance issues.

{¶48} Candell Looman, a caseworker with LCDJFS, testified that she was on call on February 28, 2009 when the police called her. She later was assigned as the ongoing caseworker and remained so until she was laid off in August of 2009. Looman testified that when she was contacted by the police, she went to the parties' home and found an unsanitary house with dog feces, alcohol and beer containers and

cockroaches and also found nine adults, two children, six dogs and a bloody knife. One of the individuals who was residing in the home had stabbed himself during an altercation with appellant Elsie S..

{¶49} Looman testified that the parties' case plan required them to maintain their home in a safe and clean manner, to make positive decisions in order to protect their children, and to complete a psychological evaluation and to follow any recommendations. The case plan also required appellants to not break any laws, to attend the agency's parenting program and to obtain stable employment and income and maintain stable housing. The case plan also addressed concerns over appellant's Elsie S.'s use of drugs and alcohol and anger management issues. Appellant Elsie S. was to remain substance free and to go to LAPP.

{¶50} Looman testified that both appellants completed their LAPP assessments and psychological exams, and that while appellant Elsie S. was going to LAPP, she did not do so consistently. On August 20, 2009, the day that Looman was laid off from her job, appellant Elsie S. had a positive screen for marijuana. Looman further testified that appellant Elsie S. had not enrolled in anger management classes.

{¶51} According to Looman, the case plan also addressed the parties' need to meet their children's health needs. R.S., Jr. had to have five caps and five fillings because his teeth were so bad and both children were behind on their immunizations. For such reasons, the parents were asked to participate in the agency's parenting program and to make sure that the children had regularly scheduled doctor's appointments.

**{¶52}** Looman testified that R.S., Jr. was showing signs of aggression and sexualized behavior and that he was physically abusing animals.

**{¶53}** When she left in August of 2009, Looman did not believe that the parents had resolved the problems, but she was looking toward increasing visitation with the children because of the work that appellants were doing.

**{¶54}** Erin Heard, a counselor with Licking County Alcoholism Prevention Program (LAPP), testified that she was appellant Elsie S.'s counselor and that appellant Elsie S. told her that alcohol was not involved in the April 17, 2010, incident with George Davenport. Based on appellant Elsie S.'s previous diagnosis for alcohol abuse, she had been recommended to LAPP's intense programming called War that met three days a week, two and a half hours a day for five weeks. The program teaches individuals to develop coping skills for sobriety. Heard testified that she recommended appellant Elsie S. for War on April 7, 2010 and that she started the program on April 27, 2010, but did not complete the same because she said that she had to work. According to Heard, appellant Elsie S. attended only one. At the time appellant Elsie S. was placed in the War program, she was not employed. Heard testified that she attempted to work with appellant Elsie S. about arranging her work schedule so that she could attend.

**{¶55}** Julie Smith, a caseworker, testified that she was assigned to this matter in August of 2009 after Candell Looman was laid off. Smith testified, in relevant part, as follows:

**{¶56}** "A. Well, when I received the case in August, at that particular -- at that specific moment, [Elsie S.] had tested positive for marijuana, so, at that point they had

been having outside visits.  So that particular -- that specific week, the same week we brought the visits back in.

{¶57}  "As far as all of the case plan goals and all the issues that we were -- had concerns with was relationship instability, mental health concerns anger management with [Elsie S.], drug and alcohol use and abuse, parenting needs, basic -- the children's basic needs being met, the unsafe individuals around the children, criminal history, and [Richard S.'s] personal hygiene."  Transcript of July 14, 2010 hearing at 47-48.

{¶58}  Julie Smith noted that the parties had gotten divorced and the psychological evaluations indicated that appellant Richard S. was functioning in the mild to moderate range of mental retardation and had "little learning potential as a parent and few useless [sic] skills as a parenting figure." Id at 49. The evaluation showed that appellant Elsie S. was impatient and tended to rationalize. While appellant Elsie S. was referred to a weekly mental health group, she stopped before the same was complete but did complete anger management counseling before the April 2010 incident. According to Smith, appellant Elsie S. repeatedly canceled or rescheduled group and individual counseling sessions and would start services again and then stop again.  She noted that when she took over in August, appellant Elsie S. had a positive drug screen and that to be in the parenting program, one had to be sober for ninety days.

{¶59}  Julie Smith noted that appellant Richard S. had had eight residences and had told her that he was moving to a larger apartment next door. She voiced concerns over the fact that appellant Richard S.'s wife did not have custody of her own three children, had not had custody for two years and had not chosen to get custody. Julie Smith also testified that she had concerns that if those three children moved in with

appellant Richard S. and his wife, there would be five children and two adults in a one or two bedroom apartment.

{¶60} The following testimony was adduced when Julie Smith was asked what was in the best interest of the children:

{¶61} "A. I have.  Children require structure, schedules, routines, consistency, and R.S. and A.S. haven't been given that.  They've been involved with the agency before.  There are past referrals on the children.  They've been out of the home since April of '09, so, it's been almost a year and a half.  The parents have made some progress, but not a lot, not significant progress.  And the progress they have made has only been since I filed for permanent custody, the significant progress.

{¶62} "When they have trouble -- when the parents have trouble providing structure and stability for themselves, then I -- that's my main concern, is it's likely that they will also have trouble providing that for their own children.

{¶63} "So, my recommendation is that, because of the stability and permanency that the parents have not demonstrated they could provide, I believe it's in the best interest of the children.

{¶64} "Q. And you don't see that changing in the near future?

{¶65} "A. I don't.  They haven't demonstrated that yet…"  Transcript of July 14, 2010 hearing at 60-61.  She testified that she believed that permanent custody was in the children's best interest.

{¶66} The Guardian Ad Litem, in her June 21, 2010, supplemental report, recommended that permanent custody of the children be granted to LCDJFS because it

was in their best interest.  She noted that "both parents continue to make poor choices and have not been able to overcome many of their issues since March of last year."

{¶67}  After the Magistrate, in a Decision filed on August 3, 2010, recommended that appellants' parental rights be terminated and that permanent custody of the children be granted to LCDJFS, both appellants filed objections to the same. Pursuant to a Judgment Entry filed on October 19, 2010, the court overruled the objections and approved and adopted the Magistrate's decision. The trial court terminated appellants' parental rights and granted permanent custody to LCDJFS.  The trial court, in its Judgment Entry, noted that the children had special needs that appellants could not meet, and that appellants themselves had special needs.

{¶68}  Appellant Richard S. now raises the following assignment of error in Case No. 10CA0121:

{¶69}  "THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶70}  Appellant Elsie S. now raises the following assignments of error in Case No. 10CA0127:

{¶71}  "I. MS. [S.'s] RIGHTS TO NOTICE AND DUE PROCESS OF LAW UNDER THE OHIO AND UNITED STATES CONSTITUTIONS WERE VIOLATED WHEN THE STATE'S MOTION FOR PERMANENT CUSTODY FAILED TO COMPLY WITH JUVENILE RULE 19.

{¶72}  "II. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT PROCEEDED TO TRIAL ON A DEFICIENT MOTION.

{¶73} "III. MS. [S.'s] RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN COUNSEL'S PERFORMANCE FELL BELOW AN OBJECTIVELY REASONABLE STANDARD AND HER DEFICIENT PERFORMANCE RESULTED IN PREJUDICE AT THE HEARING.

{¶74} "IV. THE COURT'S FINDING THAT MS. [S] FAILED CONTINUOUSLY AND REPEATEDLY TO SUBSTANTIALLY REMEDY THE CONDITIONS CAUSING A.S. AND R.S., JR. TO BE PLACED OUTSIDE THE HOME IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶75} "V. THE TRIAL COURT ERRED IN FINDING THAT THE CHILDREN'S BEST INTEREST WOULD BE SERVED BY TERMINATION MS. [S's] PARENTAL RIGHTS."

{¶76} For purposes of judicial economy, this Court shall consider the two cases together.

Case No. 10CA0127

I, II, III

{¶77} Appellant Elsie S., in her first assignment of error in Case No. 10CA0127, argues that her rights to notice and due process of law under the Ohio and United States Constitutions were violated when the Motion for Permanent Custody failed to comply with Juv.R. 19. In her second assignment of error, she argues that the trial court erred in proceeding to trial when the Motion for Permanent Custody failed to comply with Juv.R. 19. Finally, in her third assignment of error, appellant Elsie S. maintains that

her trial counsel's failure to move to dismiss the motion constituted ineffective assistance of counsel.

**{¶78}** Juv.R. 19 states, in relevant part, as follows: "An application to the court for an order shall be by motion. A motion other than one made during trial or hearing shall be in writing unless the court permits it to be made orally. It shall state with particularity the grounds upon which it is made and shall set forth the relief or order sought." "The purpose of Juv.R. 19 is to provide the nonmoving party notice of the allegations in the motion so that they can respond appropriately." *In re Lane,* Washington App. No. 02CA61, 2003-Ohio-3755, at ¶ 8, citing Fink, Greenbaum & Wilson, Guide to the Ohio Rules of Civil Procedure (2003 ed.), Section 7.9.

**{¶79}** Appellant Elsie S. specifically argues that the Motion for Permanent Custody in this case did not allege any specific ground for granting custody under R.C. 2151.413 and that; therefore, she did not receive adequate notice of the ground on which LCDJFS was proceeding.

**{¶80}** R.C. 2151.414 states, in relevant part, as follows: (B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

**{¶81}** "(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period,

or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

**{¶82}** "(b) The child is abandoned.

**{¶83}** "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

**{¶84}** "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state."

**{¶85}** LCDJFS, in its Motion for Permanent Custody, alleged, in relevant part, as follows:

**{¶86}** "The Agency has been involved with this family since February 2009, due to the children being subjected to unsafe individuals, due to unstable and unsanitary housing, due to the lack of parenting skills, due to financial instability that affected the parents' ability to provide for their children, and due to alcohol and drug issues. The

matter came forward for adjudication on May 11, 2009, and the Court found the children to be dependent.

{¶87} "The Agency herein is requesting permanent custody of the children at this time.

{¶88} "Ohio Revised Code Section 2151.413(A) states the following:

{¶89} "A public children series agency or private child placing agency that, pursuant to an order of disposition under division (A)(2) of section 2151.353 of the Revised code … is granted temporary custody of a child … may file a motion in the court that made the disposition of the child requesting permanent custody of the child…

{¶90} "The Agency maintains that it has made reasonable efforts to return the children home by providing the services required by the Case Plan to the parents. Unfortunately, the parents have not been meeting the goals of the Case Plan, including but [not] limited to the fact that they are still associating with individuals who are unsafe for their children.  See January 14, 2010 Sunset Summary, attached hereto and incorporated herein."

{¶91} Attached to and incorporated into the motion was a January 14, 2010, two page Sunset Summary which outlined the reasons why permanent custody was being requested.  The Sunset Summary indicated that the police had been called to the parties' home on February 28, 2009, and that the house was unsanitary and numerous adults were residing there in addition to appellants and the children.  The Sunset Summary further noted that the parties' housing situation was unstable, that appellant Richard S. was illiterate and that appellant Elsie S. lacked reliable employment. According to the Sunset Summary, appellant Elsie S. had tested positive for marijuana,

amphetamines and methamphetamines and failed to comply with counseling recommendations.

**{¶92}** We find that the permanent custody motion complied with Juv.R. 19 because it gave notice to appellant Elsie S. that relief was being requested because of the failure of appellants to comply with their case plan. From the complaint and Sunset Summary it is clear that the Agency was requesting permanent custody because the children could not or should not be placed with appellants within a reasonable time. See *Matter of Evans* (Nov. 23, 1987), Miami App. No. 87 CA 12, 1987 WL 26739 ("Appellee filed a motion for permanent custody alleging: that more than six months elapsed since the grant of temporary custody; that appellant failed to comply with the terms of the comprehensive reunification plan; that the father did not enter into a plan; and that a grant of permanent custody would be in the best interest of the child. Appellee's motion complied with the statutory requirements of R.C. 2151.413 and 2151.414. Juv.R. 19 covers all types of motions and requires statements of grounds and requested relief but not detailed facts. *In re Lucas,* (1985), 29 Ohio App.3d at 170. Appellee's motion met the basic requirements of notice. See *In re Crose* (Oct. 18, 1982), Darke App. No. CA 1055, unreported.") Id at 1.

**{¶93}** Appellant's first, second and third assignments of error are, therefore, overruled.

Case No. 10CA0121 and Case No. 10CA0127

**{¶94}** Appellant Elsie S., in her fourth and fifth assignments of error in Case No. 10CA0127, argues that the trial court's finding that she failed continuously and repeatedly to substantially remedy the conditions causing the children to be removed from her home is against the manifest weight of the evidence and that the trial court erred in finding that the children's best interest would be served by terminating her parental rights. Appellant Richard S., in his sole assignment of error in Case No. 10CA0121, argues that the trial court's decision was against the manifest weight to the evidence.

**{¶95}** A trial court's decision to grant permanent custody of a child must be supported by clear and convincing evidence. The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty, as required beyond a reasonable doubt, as in criminal cases." *Cross v. Ledford* (1954), 161 Ohio St. 469, 120 N.E.2d 118; *In re: Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 481 N.E.2d 613.

**{¶96}** In reviewing whether the trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54, 60; See also, *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578. If the trial court's judgment is "supported by some competent, credible evidence going to all the

essential elements of the case," a reviewing court may not reverse that judgment. *Schiebel,* 55 Ohio St.3d at 74, 564 N.E.2d 54.

{¶97} Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." *Id.* Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273:

{¶98} "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."

{¶99} Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 1997-Ohio-260, 419, 674 N.E.2d 1159; see, also, *In re: Christian,* Athens App. No. 04CA10, 2004-Ohio3146; *In re: C. W.,* Montgomery App. No. 20140, 2004-Ohio-2040.

{¶100} Pursuant to 2151.414(B)(1), the court may grant permanent custody of a child to the movant if the court determines "that it is in the best interest of the child to grant permanent custody to the agency that filed the motion for permanent custody and that any of the following apply:

{¶101} "(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child

placing agencies for twelve or more months of a consecutive twenty-two month period, ... and the child cannot be placed with either of the child's parents within a reasonable period of time or should not be placed with the child's parents.* * *"

{¶102} Revised Code 2151.414(E) sets forth the factors a trial court must consider in determining whether a child cannot or should not be placed with a parent within a reasonable time. If the court finds, by clear and convincing evidence, the existence of any one of the following factors, "the court shall enter a finding that the child cannot be placed with [the] parent within a reasonable time or should not be placed with either parent":

{¶103} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parent to remedy the problem that initially caused the child to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions that caused the child to be placed outside the child's home. In determining whether the parents have substantially remedied the conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.* * *

{¶104} "(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section…

{¶105} "(16) Any other factors the court considers relevant."

{¶106} A trial court may base its decision that a child cannot or should not be placed with a parent within a reasonable time upon the existence of any one of the R.C. 2151.414(E) factors. The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time. See *In re: William S.*, 75 Ohio St.3d 95, 1996-Ohio-182, 661 N.E.2d 738; *In re: Hurlow* (Sept. 21, 1998), Gallia App. No. 98 CA 6, 1998 WL 655414; *In re: Butcher* (Apr. 10, 1991), Athens App. No. 1470, 1991 W L 62145.

{¶107} In the case sub judice, testimony was adduced at the hearing that appellant Elsie S. has had ongoing substance abuse problems as well as run-ins with the law. As is set forth above, the police were called on April 17, 2010, after she threatened a developmentally disabled person and, as a result, charges were filed and she was convicted of disorderly conduct. There was testimony that she was intoxicated at the time. Testimony also was adduced that appellant Elsie S. has not maintained stable employment and was behind on her rent. Furthermore, there was testimony to the effect that a sex offender was residing with her until shortly before the hearing and that appellant, although recommended to do so, declined to participate in the War program, an intensive outpatient treatment program, citing her work schedule. There was evidence that she could have made arrangements for the War program, but declined to do so in order to work more hours.

{¶108} With respect to appellant Richard S., testimony was adduced that he is mildly mentally retarded and is unemployed. He testified that he had not worked since 2005 and cannot read, write or spell. Testimony also was adduced that he lacked stable housing. In addition to the testimony set forth above, at the hearing, Michele Kennedy of

LCDJFS testified that she had occasion to work with both appellants in August of 2005 in reference to appellant Richard S.'s son Zachary who was born on June 15, 2004. At the time, a case plan was developed to help appellant Richard S. reunify with his son. The case plan required both appellants to maintain stable housing and employment. Kennedy testified that appellant Richard S. fell asleep during parenting classes and that appellants failed to make any significant progress in their case plan, in such case causing the agency to file for permanent custody of Zachary.

{¶109} In addition, to the forgoing, testimony was adduced that the children's medical and dental needs were not being properly addressed.

{¶110} Based on the forgoing, we find that the trial court did not err in finding that appellants had failed continuous and repeatedly to substantially remedy the conditions causing them to be placed outside the home.

{¶111} The next issue for determination is whether or not the trial court erred in finding that the children's best interest would be served by terminating appellants' parental rights.

{¶112} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the

child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

{¶113} Testimony was adduced that R.S., Jr. and A.S. were doing well in their foster home and that their medical issues were being addressed. While A.S. has albinism and visual problems, R.S., Jr. has problems with aggression. R.S., Jr. had expressed a strong desire to return home. The Guardian Ad Litem, in a supplemental report filed on June 21, 2010, recommended that permanent custody of both children be granted to LCDJFS "as it is in their best interest." In her report, she noted that "both parents continue to make poor choices and have not been able to overcome many of their issues since March of last year." The Magistrate, in his Decision, noted that the children were very young and would need care for many years and that adoption was the only secure option for them. The agency was attempting to a find foster-to-adopt home where the children could remain together.

{¶114} Based on the foregoing, we find that the trial court did not err in finding that the children's best interest would be served by terminating appellants' parental rights.

{¶115} In short, we find that the trial court's decision terminating appellants' parental rights and granting permanent custody of A.S. and R.S., Jr. was not against the manifest weight of the evidence.

{¶116} The fourth and fifth assignments of error in Case No. 10CA0127 and the sole assignment of error in Case No. 10CA0121 are, therefore, overruled.

{¶117} Accordingly, the judgment of the Licking County Court of Common Pleas, Juvenile Division, is affirmed.

By: Edwards, J.

Gwin, P.J. and

Wise, J. concur

_____

_____

_____

                              JUDGES

JAE/d0203

[Cite as *In re A.S.*, 2011-Ohio-982.]

IN THE COURT OF APPEALS FOR LICKING COUNTY, OHIO

FIFTH APPELLATE DISTRICT

IN THE MATTER OF:                          :
                                           :
    A.S. & R.S., Jr.                   :
                                           :
                                           :
                                           :
                                           :     JUDGMENT ENTRY
                                           :
                                           :
                                           :
                                           :     CASE NOS. 10-CA-121 & 10-CA-127


    For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Licking County Court of Common Pleas, Juvenile Division, is affirmed. Costs assessed to appellants.


                                          _____


                                          _____


                                          _____

                                                    JUDGES