OPINION
{¶ 1} Lorine W., the mother of C.W., appeals from an order of the trial court awarding permanent custody of her dependent child to the Montgomery County Children's Services Board, thereby terminating her parental rights. The mother contends that the trial court erred in finding that an award of permanent custody to the CSB is in the best interests of the child, and that the trial court's finding is against the manifest weight of the evidence. We conclude that there is evidence in the record to support the trial court's findings, and that its findings are not against the manifest weight of the evidence. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 2} Lorine W. and her husband became C.W.'s foster parents when he was a little over two years old. They adopted C.W. when he was six years old. At about that time, he was diagnosed with Reactive Attachment Disorder. He has also been diagnosed with Post-Traumatic Stress Disorder. C.W.'s mother testified that when they had him psychiatrically evaluated, they "found out that he had reactive attachment disorder, posttraumatic stress, ADDHD, fetal — some fetal alcohol and bipolar schizophrenia." C.W.'s mental disorders result in extreme behaviors, including sexual abuse of younger children and self-destructive acts. One of the latter acts was described by C.W.'s mother as follows:
 {¶ 3} "He was kicking the walls and banging his head on things — and he had his feet bleeding, his head bleeding. We were trying to hold him so he wouldn't get hurt. . . . And then the doctors told us to take him to Dettmer [hospital] and I was holding his arms and I told (unintelligible) because I didn't want him to kick around any more. And (unintelligible). And — and Dr. Hardman and Dr. Packard called Dettmer and told Dettmer that they both recommended immediate admittance."
 {¶ 4} C.W. has been hospitalized more than once because of his extreme behaviors. C.W.'s adoptive parents had a contentious relationship with CSB, which included having sued CSB in connection with a prior adoption of another child. Despite their wariness concerning CSB, they sought the CSB's assistance in October, 2000, having run out of other options. C.W. was determined to be a dependent child, and temporary custody was awarded to the CSB. At this time, C.W. was nine years old.
 {¶ 5} In September, 2002, the CSB filed a motion for commitment of C.W. to the CSB's permanent custody, alleging, pursuant to R.C. 2151.414(B)(1)(d), that C.W. had been in its custody for twelve or more months out of a consecutive twenty-two month period, and that it was in the best interests of the child for permanent custody to be awarded to CSB.
 {¶ 6} Following a hearing, a magistrate rendered a decision awarding permanent custody to the CSB, finding that to be in C.W.'s best interests. The mother objected to this decision.
 {¶ 7} The trial court overruled the mother's objections and adopted the magistrate's decision as its own order, while making the following findings:
 {¶ 8} "Upon a careful review of the objections, including the record and transcript, the Court hereby OVERRULES the same. Pursuant to Ohio Revised Code § 2151.414, the child has been in the temporary custody of MCCS since October 30, 2000, which is more than twelve out of the past 22 months, so the Court need not consider whether the child could be placed with [the parents] within a reasonable [amount] of time. Further, the Court finds that due to the extreme psychological needs of the child, the child cannot be reunified with either parent within a reasonable time. The Court finds that the child requires a significant level of medical and personal attention and supervision that [the parents] are unable to fully provide. Although [the parents] have made some efforts, the parents have not taken full advantage of the opportunities available for visitation, as there were issues with the distance and [the father's] work schedule. (Tr. 13-16). Further, the Court has concern for the safety of the child, the safety of [the parents], and the safety of their young children should the child be placed back into their home with the little change that has occurred. Thus, the Court finds it to be in the best interests of the child for permanent custody to be granted to MCCS. O.R.C. § 2151.414.
 {¶ 9} "The child has been diagnosed with reactive attachment disorder, posttraumatic stress disorder, bipolar schizophrenia, and had issues with sexually acting out. (Tr. 12, 17, 78). Said child has a history of lying as well. (Tr. 47). The [parents], who adopted said child, originally returned the child to MCCS after adopting him seeking residential treatment and an assessment to address the child's special needs. (Tr. 41). Subsequent to his return to MCCS, the child has been placed with two foster families, the second of which has special training in dealing with children with special needs, and the child has received counseling for his psychological disorders. (Tr. 53-58).
 {¶ 10} "Statements made by the [parents] lead the Court to believe that they believe that returning custody of the child to them is not currently in the best interests of the child. [The mother] testified at the hearing that she wanted the child back immediately if the Agency is not going to provide any more help for him. (Tr. 117). Moreover, [the father] testified that he did not believe it was in the best interests of the child for him to be returned to their home currently, as he needs additional help before he could return to their home. (Tr. 131). [The father] testified that the child had worn him down, since he was previously called six-eight times per week to come home from work and correct the child before they returned him to MCCS for help. This occurred until he felt that he could not handle the situation any longer and felt it necessary to return the child for assistance. (Tr. 125). It appears to the Court from the testimony that little has changed in the way of the child's behavior since the time that the family returned the child to MCCS in 2000, so it seems that child would still demand a very high degree of discipline and supervision.
 {¶ 11} "Further, the Court finds that the child is a danger to himself and to others through his threats and actions. He sexually perpetrated on the first foster parents' grandson causing the child to be removed from that placement. (Tr. 15). The child attempted to kill himself by running out into traffic and has threatened to blow up his foster home and his school. (Tr. 19). He was also hospitalized for his acting out, as he claims to hear voices and has thought that he was the devil. (Tr. 19). The child acts out negatively especially after visits with the [parents], which puts himself and others in danger for several days. (Tr. 67). He has broken three of [the mother's] toes and kicked her in the ribs. (Tr. 81). The caseworker stated that the Agency was willing to reunify the child with his parents if he could maintain [sic] his negative behaviors, but that has not occurred. (Tr. 26). There are also concerns about the safety of [the parents'] younger children due to the sexually inappropriate behavior that was revealed with another child. (Tr. 39).
 {¶ 12} "The child is adoptable. (Tr. 38). The child has expressed that he does not wish to return to the [parents]. (Tr. 22). The Guardian Ad Litem has recommended that the Agency's motion for permanent custody be granted. (Tr. 135). In summary, the Court finds that clear and convincing evidence has been presented that it is in the best interest of the child for permanent custody to be granted to MCCS and for continued services to be provided to help the child with his psychological problems."
 {¶ 13} From the order of the trial court awarding permanent custody of C.W. to the Montgomery County Children Services Board, the mother appeals.
 II {¶ 14} The mother's assignments of error are as follows:
 {¶ 15} "The trial court erred in finding the grant of permanent custody of [c.w.] to montgomery county children's services board to be in the best interest of the child.
 {¶ 16} "The grant of permanent custody to csb was against the manifest weight of evidence."
 {¶ 17} A trial court has broad discretion in custody disputes, and a reviewing court's authority to reverse the trial court is limited to situations where the trial court's decision is against the manifest weight of the evidence. The Ohio Supreme Court has recognized that the deference to be accorded to a trial court's assessment of conflicting evidence in child custody disputes is especially great, because the credibility issue is "even more crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well." Davis v. Flickinger (1997),77 Ohio St.3d 415, 419, cited in In re Stansell (Aug. 6, 1999), Montgomery App. No. 17693.
 {¶ 18} We have reviewed the entire transcript of the trial, and we conclude that there is evidence in the record to support the findings made by the trial court in its order overruling the mother's objections and adopting the decision of the magistrate as the order of the trial court.
 {¶ 19} As the trial court notes, because C.W. has been in the temporary custody of the CSB for twelve or more months out of a consecutive twenty-two month period, so that the CSB has predicated its motion for permanent custody upon R.C.2151.414(B)(1)(d), the CSB is not required to prove that the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents, as would be required to be proven if the motion were predicated upon R.C. 2151.414(B)(1)(a). The CSB is only required to prove, by clear and convincing evidence, that it is in the best interests of the child to grant permanent custody to the CSB.
 {¶ 20} Nevertheless, the trial court is required to consider "all relevant factors, including, but not limited to, the following:
 {¶ 21} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster care-givers and out-of-home providers and any other providers and any other person who may significantly affect the child;
 {¶ 22} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 23} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 24} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 25} "(5). . . ."
 {¶ 26} R.C. 2151.414(D).
 {¶ 27} C.W.'s mother cites In re Makuch (1995),101 Ohio App.3d 45, at 47, for the proposition that government should provide such services and support as appropriate to assist the family to care for its own children, and only as a last resort should parental rights be terminated. The opinion in that case did include that proposition as a general statement of legal principles, but nevertheless affirmed the termination of parental rights in that case, opining that the two years that had elapsed in attempting to reunite that child with her mother had been long enough, and that: "the child's best interests are clearly served by getting on with the process of providing her with a permanent, stable, adoptive home." Id, at 48.
 {¶ 28} Significantly, in the case before us almost three years had elapsed from the time C.W. was temporarily placed with CSB to the time of the hearing on the CSB's motion for permanent custody.
 {¶ 29} As C.W.'s mother notes in her brief, this case is unlike the usual cases involving termination of parental rights, because it is not about the suitability of the parents, in general, but whether they are up to the unusual problems posed by C.W.'s extreme behavioral disorders.
 {¶ 30} C.W.'s mother makes two essential arguments in support of her proposition that insufficient efforts were made toward, or insufficient consideration given to, the objective of reuniting her with C.W., or, at least, not severing that relationship altogether. The first of these is that by structuring family counseling to take place at a location in Chillicothe, 100 miles distant from their home, the CSB created practical difficulties that prevented the counseling from being effective. The second of these arguments is that the CSB never made inquiry concerning the possibility of placing C.W. with a relative.
 {¶ 31} In support of her first argument, the mother cites Inre Brown (1994), 98 Ohio App.3d 337. In that case, an award of permanent custody was reversed because the agency had not made sufficient efforts to reunify the child with her family. The court noted that although the case plan recommended that all three family members were to receive separate psychological evaluation and counseling, which they did, "No counseling was ever even suggested to assist the Browns in developing parenting skills or family relationships."
 {¶ 32} In our view, C.W.'s mother's reliance upon In reBrown is misplaced. To begin with, in that case, unlike in the case before us, the trial court was required to find that the child could not, or should not, be placed with either parent within a reasonable time, and in that connection, was required to consider certain factors set forth at R.C. 2151.414(E). Furthermore, the court noted that no counseling "was ever even suggested" to assist the parents in that case in developing parenting skills or family relationships. In the case before us, family counseling appropriate to the unusual mental disorders afflicting C.W. was arranged in Chillicothe. There was testimony that the therapist in Chillicothe was a specialist in reactive attachment disorders, and that specialists closer to home were not a possibility, at least in part because the parents had indicated they would not go back to one of the specialists who had been seeing C.W.
 {¶ 33} There was also testimony in the record from which the trial court could find, as it did, that C.W.'s parents are unable to provide the level of medical and personal attention and supervision that C.W. requires.
 {¶ 34} We conclude that there is evidence in the record to support a finding that the CSB made reasonable efforts toward the goal of reunification.
 {¶ 35} With respect to CW's mother's second argument — that the CSB did not give sufficient consideration to the possibility of placing C.W. with a relative — we note, first of all, that this is not an express statutory requirement. The possibility of placement with a relative is arguably something that ought to be considered in connection with "the interaction and interrelationship with the child, with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child," which is a factor to be considered in determining the best interests of the child, pursuant to R.C. 2151.414(D)(1).
 {¶ 36} Although the caseworker for the CSB acknowledged that he had not thought to inquire about the possibility of placement with a relative ("I missed that part"), he did testify that no relatives had approached him concerning placement. Concerning this possibility, C.W.'s mother testified, at the hearing, only as follows:
 {¶ 37} "My sister's ex-husband and [C.W.] were very, very close. We're all very close. He was at dinner with us at — when we had [C.W.] and — when we — when we had visits with [C.W] and everything. He might be willing to take him."
 {¶ 38} In view of C.W.'s extraordinary special needs, we conclude that the possibility that the one person referred to by C.W.'s mother in her testimony would be a suitable placement is remote, at best. The evidence strongly suggests that C.W.'s mental health issues made a placement with a relative no more likely to be successful than the placement with his parents.
 {¶ 39} We conclude that the remote possibility that a relative might have been found for which a placement would be suitable does not cause this factor to outweigh the other factors that the trial court considered in determining that C.W.'s best interests would be served by awarding permanent custody to the CSB.
 {¶ 40} In short, we conclude that the trial court's findings support the conclusion that an award of permanent custody to the CSB was in C.W.'s best interests, that those findings are, in turn, supported by the evidence in the record, and that those findings are not against the manifest weight of the evidence. Accordingly, both of C.W.'s mother's assignments of error are overruled.
 III {¶ 41} Both of C.W.'s mother's assignments of error having been overruled, the judgment of the trial court is affirmed.
Judgment affirmed.
Wolff and Young, JJ., concur.