[Cite as *In re A.P.*, 2011-Ohio-1909.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | : | JUDGES: |
| | : | W. Scott Gwin, P.J. |
| | : | Sheila G. Farmer, J. |
| A.P. | : | Julie A. Edwards, J. |
| | : | |
| (Minor Child) | : | Case No. 10-CA-65 |
| | : | |
| | : | |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING:        Civil Appeal from Fairfield County
                                                        Court of Common Pleas, Juvenile
                                                        Division, Case No. 2008-AB-123

JUDGMENT:                                   Affirmed

DATE OF JUDGMENT ENTRY:       April 14, 2011

APPEARANCES:

For Appellee                                   For Appellant – Jason Barbee, Father

JULIE S. BLAISDELL                      JACOB ORT
Assistant Prosecuting Attorney      13297 Rustic Drive
Fairfield County, Ohio                     Pickerington, Ohio  43147
201 South Broad Street – 4th Floor
Lancaster, Ohio  43130

For Guardian Ad Litem & A.P.

CHRISTINE McGILL
123 Broad Street, Ste. 207
Lancaster, Ohio  43130

*Edwards, J.*

{¶1} Appellant, Jason Barbee, appeals from the December 13, 2010, Entry of the Fairfield County Court of Common Pleas, Juvenile Division, terminating appellant's parental rights and granting permanent custody of A.P. to Fairfield County Child Protective Services.

<u>STATEMENT OF THE FACTS AND CASE</u>

{¶2} Appellant Jason Barbee and Melissa Price are the parents of A.P., who was born on October 4, 2007. The two were never married.

{¶3} On June 23, 2008, Fairfield County Department of Job and Family Services (FCCPS) filed a complaint alleging that A.P. was a dependent child. The complaint indicated that appellant and Melissa had a history with Fairfield County Child Protective Services dating back to 2008 that included concerns over illegal substance use, untreated mental health concerns and domestic violence. Following a shelter care hearing, A.P. was placed in the temporary custody of FCCPS.

{¶4} As memorialized in an Entry filed on August 19, 2008, A.P. was found to be a dependent child and temporary custody of her was granted to Fairfield County Child Protective Services. The trial court, in its Entry, ordered appellant to submit to an evaluation at the Recovery Center to determine whether he had issues with drugs and/or alcohol and to successfully comply with all recommendations. Appellant also was ordered to submit to random drug and/or alcohol screens.

{¶5} On April 28, 2009, the temporary custody of A.P. with Fairfield County Child Protective Services was terminated and A.P. was returned to the custody of Melissa under court ordered protective supervision. As memorialized in an Entry filed

on August 18, 2009, A.P. was again placed in the temporary shelter care custody of Fairfield County Child Protective Services.

{¶6} Thereafter, on September 14, 2009, Fairfield County Child Protective Services filed a motion seeking temporary custody of A.P. Pursuant to an Entry filed on October 27, 2009, A.P. was again placed in the temporary custody of Fairfield County Child Protective Services.

{¶7} On March 3, 2010, Fairfield County Child Protective Services filed a motion seeking permanent custody of A.P. The motion stated, in relevant part, as follows:

{¶8} "The agency represents to the Court that there has been a lack of progress and consistency for both Melissa Price and Jason Barbee, [appellant] parents of A.P. The agency represents to the Court that A.P. cannot be reunified with either parent within a reasonable time or should not be reunified with either parent."

{¶9} On September 9, 2010, the Guardian Ad Litem filed a report recommending that A.P. be placed in the permanent custody of Fairfield County Child Protective Services.

{¶10} Thereafter, a trial on such motion commenced on October 26, 2010. Prior to the start of trial, Melissa, who was represented by counsel, indicated to the trial court that she was not contesting the agency's motion for permanent custody of A.P.

{¶11} At the trial, appellant testified that he had three children, the youngest of whom was A.P. While his oldest child was living with him, appellant had lost visitation rights with respect to his middle child. Appellant testified that he had been in jail three times and that, in January of 2008, he went to jail after violating his probation by failing

a drug test for marijuana. At the time, appellant was on probation for a 2005 driving under the influence conviction. Appellant testified that he was in jail again from May 28, 2008, to July 29, 2008, for the same thing and then was in jail again from September 2, 2008, to October 12, 2008, which was during A.P.'s first birthday. Appellant testified that he was in jail during such time because he purposefully took drugs so that he could fail his drug test and finish his last thirty days in jail. Appellant, when asked, admitted that he knew that he would miss A.P.'s first birthday if he failed his drug test and went back to jail.

{¶12} At trial, appellant testified that he was picked up on a second driving under the influence charge on March 14, 2010, and served ten days in jail, from July 19, 2010, to July 29, 2010. At the time, appellant's blood alcohol content was .12, but appellant denied that he was intoxicated at the time. Appellant, as of the time of the trial, was on probation for the second driving under the influence charge and knew that, if he violated the same, he could end up serving 170 days in jail. According to appellant, he had never been to jail for anything other than the driving under the influence or the probation violations. He testified that the last time that he used alcohol was in March of 2010.

{¶13} Appellant testified that his oldest daughter came to live with him in May of 2010 and that, when he was in jail in July for ten days, his mother and father took care of her. Appellant testified that he lived with his parents. He admitted that it was difficult for him to take care of children while he was in jail.

{¶14} Appellant testified that, in late July of 2008, he was ordered to submit to random screens for drugs and/or alcohol, to get an evaluation of drug and/or alcohol issues and to follow any recommendations. He testified that his case plan required him

to follow through with counseling for drugs and alcohol and that he agreed with the case plan. Although he was released from jail on October 12, 2008, appellant did not get an evaluation for drugs and/or alcohol at Scioto Paint Valley until November or December of 2008, because it was hard to get in touch with his counselor, Robert Frazier. He testified that it sometimes took two or three months to get in to see Frazier. Appellant testified that he had not submitted to any screens for drugs or alcohol until October 14, 2008, although he was ordered to do so on July 31, 2008.

{¶15} Appellant testified that he had not received group counseling and that he received individual counseling from Robert Frazier every two weeks. He testified that he last saw Frazier the end of September of 2010, and that although he had rescheduled a session that was set for the first week of October, he missed the same because he did not write the date down. Appellant had an appointment to see Frazier scheduled for November 15, 2010. Appellant had started counseling with Frazier in 2006 due to his first driving under the influence. He testified that the only time that he had shown any consistency in meeting with Robert Frazier was in August and September of 2010. Appellant also testified that he did not attend group counseling because the group sessions were held on Tuesdays at 5:00 p.m. and, if he was not at work, he was exercising visitation.

{¶16} Appellant, when asked, testified that according to the classes that he had attended, he thought that he was an alcoholic. However, on direct, he testified that he did not believe that he had a substance abuse or alcohol problem. He was unable to state how many sober days that he had and, while he started attending twelve-step

meetings, stopped once he reached step three. He had not attended a twelve-step program in over a year and did not have a sponsor.

{¶17} Testimony was adduced that appellant had been living with his parents for approximately two years and that he lived on and off with them for his whole life. He does not pay rent. When asked if he would financially be able to live on his own, appellant indicated that he would not and, if forced to leave his parents' house, would try to find public assistance. Appellant testified that he was not currently employed and that he last had a job in April of 2010 as an electrician through a temporary agency. He had worked for the agency for approximately a year and a half until he was laid off. Appellant testified that he was on unemployment and had roughly five months left before it expired. He testified that he was waiting on one company to try and call him back and was not looking for any other type of job.

{¶18} At trial, appellant testified that his oldest daughter lived with him and that he paid for her food, clothing and necessities. He had not paid any child support for A.P. since April of 2010.

{¶19} Appellant was questioned about the trial court's July 2008, order that he submit to random screens for drugs and/or alcohol. He testified that he missed one screen in October of 2010, and missed three screens in August of 2010, because he was having problems with the breathalyzer system hooked up to his car. Appellant missed six screens in July of 2010, but was in jail ten of those days, missed three screens in March of 2010, two in February of 2010, and six in January of 2010. Appellant did not have the breathalyzer system hooked up to his car until after his second driving under the influence. Appellant missed nine screens in December of

2009, four in November of 2009, four in October of 2009 and three in September of 2009.

{¶20} Appellant testified that he did not know who A.P.'s pediatrician was and that he was ready for her to come home with him right away. While he used to see her on Sundays, he testified that he no longer did because of non-compliance with drug testing, although he continued seeing A.P. every Tuesday and Thursday from 5:00 to 7:00 for a year. Appellant testified that, in November of 2009, he missed two out of four visits with A.P. because of the weather and missed one visit in January of 2010. In February of 2010, appellant cancelled five out of eight visits due to the weather and in March of 2010, cancelled five out of nine visits due to his driving under the influence because he did not have driving privileges. Appellant also missed one visit in April of 2010, four out of eight in May of 2010, four out of nine in June of 2010, and in July of 2010, cancelled three visits. The following is an excerpt from his testimony:

{¶21} "Q. Okay. So basically in September, you only missed one visit and that would have been at the end of the month?

{¶22} "A. Yes.

{¶23} "Q. And I have that you haven't missed any visits so far in October, is that correct?

{¶24} "A. Correct.

{¶25} "Q. But that you've left early twice to go screen.

{¶26} "A. Yes.

{¶27} "Q. Is that correct?

{¶28} "A. Yes, Ma'am.

{¶29} "(Pause)

{¶30} "Q. So is it fair to say that with respect to visiting A.P. that you've really only been consistent just in September and October of 2010?

{¶31} "A. Yes.

{¶32} "Q. And then in August of 2010 that you canceled four out of nine visits, does that sound accurate?

{¶33} "(Pause)

{¶34} "A. Yes, because that was interlock problems.

{¶35} "Q. And I had that you were late for one visit, that would have been interlock?

{¶36} "A. I believe that was when my muffler fell off.

{¶37} "Q. Okay. But in September, 2010, I have that you attended all of your visits, is that correct?

{¶38} "A. Yes.

{¶39} "Q. And I believe that in August, I take that back, I have that you missed one visit at the end of September, that you were having back problems, is that….

{¶40} "Q. But that (sic) before that you were inconsistent, would you agree with that?

{¶41} "A. Sometimes." Transcript at 84- 86.

{¶42} Tracy Hotel, a caseworker for Fairfield County Child Protective Services, testified that at one point, she was assigned to A.P. and remained the caseworker until August of 2009. She testified the agency became involved with A.P. after there were reports that Melissa was using drugs with the kids present and had track marks on her

legs and that there were reports that appellant and Melissa were arguing.  Hotel testified that A.P. was in a foster home from June 24, 2008 until April 28, 2009 before going back to live with her mother. A.P. then lived with her mother until August of 2009 under court-ordered protective supervision. After the agency regained temporary custody in August of 2009, A.P. lived in a kinship home with Sherry Hines and was living there as of the time of trial.

{¶43}  Hotel testified that the agency came up with a case plan for appellant that he signed off on. The case plan required appellant to address his substance abuse issues. The agency wanted appellant to submit to random drug and/or alcohol screens and to obtain counseling for his drug and/or alcohol issues. Hotel testified that from July of 2008 through August of 2009, appellant screened approximately 57 times and only missed seven screens during that period. She testified that he was very sporadic with the counseling for drugs and alcohol and that, while she was the caseworker, it was her opinion that appellant was not complying with his case plan.

{¶44}  Hotel testified that appellant's case plan also required him to maintain housing and employment and that appellant had stable housing with his parents. She testified that appellant successfully completed this aspect of his case plan while she was the caseworker. Hotel also testified that appellant visited with A.P. about 29 out of a possible 36 times while she was the caseworker and that appellant was appropriate during the visits.

{¶45}  The next witness to testify was Robert Frazier, a clinical counselor. Frazier testified that appellant had been a client of his for about three years and that appellant received individual counseling usually Wednesdays from 7:00 p.m. to 8:00 p.m. for drug

and alcohol issues and relationship issues. He testified that there were breaks in appellant's consistency of attending due to work and money issues. Frazier testified that appellant had a substance abuse problem due to alcohol and marijuana use. He testified that appellant had made progress towards recovery and that he believed that appellant would be able to parent. On cross-examination, Frazier testified that appellant had seen him consistently since August of 2010, and that he believed that appellant had a drinking problem, but was "in a pretty stable remission." Transcript at 133. Frazier admitted that appellant, from October of 2008, to August of 2010, was very inconsistent in seeing him and that he was still recommending that appellant see him twice month. He also testified that there was no reason appellant could not attend group counseling because appellant had been unemployed since April of 2010.

{¶46} Stacey Bergstrom, a caseworker for Fairfield County Child Protective Services, testified that she was A.P.'s current caseworker and had been her caseworker since mid-August of 2009. The following testimony was adduced when she was asked about whether appellant, as part of his case plan, had been consistent with his screens for drugs and/or alcohol:

{¶47} "A. As far as his drug screening, um, that's been one, uh, area that I've tried to work with Jason over the last, um, year or so on. Um, he's been fairly inconsistent, um, as far as….

{¶48} "Q. And when you say you've tried to work with him, what kind of things are you, what do you mean when you say that?

{¶49} "A. Uh, I mean, any meeting, phone conversation, home visit that I've had with Jason, the conversation of drug screens has come up and, you know, what is

stopping him from doing his drug screening, why he isn't being consistent and encouraging him to, to do that service as it was a barrier for him to be able to reunify with [A.P.] Um, as far as his consistency, um, he hasn't been consistent up until about a couple months ago. Um, he would go through, uh, short periods of time where he would be consistent and then he wouldn't screen for long periods of time and kind of go back and forth in that manner. Um, for instance, I got the case in August of 2009. Um, in September he screened for the most part; he had three missed screens. In October of 2009, he had four missed screens and in November of 2009, he had, um, one, two, three, three to four missed screens and then he went through a huge chunk of time where he didn't screen all from November 22nd through January 2, 2010, he wasn't consistent at all with his screening and produced no screens. And then he missed screens on January 8, 2010, January 11th, January 21st, January 25th, the 27th, February 10th, February 16th. I know a couple of those times in February the weather was rough and he had called me and been in communication about what he should do because the weather was rough and I advised that he use him, use his own judgment. Um, he missed screens March of 2010 and then he went through another huge chunk of time from March 25, 2010 to June 27, 2010 without any drug screening. Um, and then another chunk of time from July 13, 2010 through August 2, 2010. Um, and since August, he's been fairly consistent; he missed, um, I believe three in August, 2010 and then one in October 4, 2010. During the month of September and October, 2010, he has been consistent, but prior to that date it's been very inconsistent.

{¶50} "Q. All right. And does that cause the agency to still have concerns about his drug or alcohol use?

{¶51} "A. Yes.

{¶52} "Q. And why is that?

{¶53} "A. Um, the drugs, the drug screening is set up in order for parents to be able to show their sobriety, to prove that they are being clean and sober without our drug screens. Uh, from parents that we work with, they, we have no way of knowing if they're being clean and sober. Um, I know Jason reported to me that he wasn't using, um, but again, I had no proof of that and then we had to concern of his DUI in March, 2010, which, um, was a definite indicator that he was using alcohol." Transcript at 159-162.

{¶54} Bergstrom further testified that appellant's counseling with Robert Frazier had been inconsistent over the last year and that appellant had gone for months at a time within counseling. Testimony was adduced that Frazier was out due to medical reasons for a chunk of time, and that appellant, although advised to seek counseling from someone else at the agency during such time, did not do so. She further testified that while a twelve step program and sponsor were not part of appellant's case plan, she had talked with appellant in August of 2009 about getting into meetings and getting a sponsor. She testified that the agency was concerned that appellant had not been to a meeting in over a year, especially given his recent driving under the influence.

{¶55} Bergstrom testified that appellant's mother, in September of 2010, had expressed interest in having placement of A.P. At the time, the trial in this matter was set for September 14, 2010. Bergstrom testified that there was a concern over the grandparents' health because both were on medical leave and, as of the fall and winter of 2010, were not in a position to take care of A.P. She testified that appellant had

complied with the aspect of the case plan requiring him to maintain stable housing, but that, due to his unemployment, the agency was concerned with his inability to support himself and A.P. once his unemployment ran out. Bergstrom testified that she suggested that appellant look for employment outside the electrical field, but that appellant declined to do so. She testified that appellant had not complied with the aspect of his case plan requiring him to maintain stable employment and that appellant had been inconsistent with his visits with A.P. until recently.

{¶56} Bergstrom testified that A.P. had been in the agency's custody going on 24 months and that, other than appellant's parents, no other family members had come forward requesting placement. She testified that A.P. had been with Sherry and Terry Hines for an extensive period of time and had bonded with them. Bergstrom testified that Sherry Hines was A.P.'s childcare provider when either the agency had custody or Melissa had custody with court-ordered protective supervision. From April of 2009 to August of 2009, the Hines' family provided protective daycare for A.P. According to Bergstrom, Melissa had suggested Sherry Hines. Bergstrom testified that A.P. needed a legally secure permanent placement because she needed stability and consistency and that A.P. could not get this type of placement with appellant due to his substance abuse issues and his legal difficulties. She indicated that the agency was concerned that appellant had been in jail five times in the last three years. The following is an excerpt from her testimony:

{¶57} "Q. What is the position of the Agency as to what would be, well, let me back up. We talked about her need for a legally secure permanent placement and you've testified that she can't have that, can't find that with her mother and that she

cannot find that with her father. Would she be able to find that type of legally secure permanent placement if she were to be placed in the permanent custody of Fairfield County Child Protective Services?

{¶58} "A. the hope would be that she would be able to, um, that she would be able to find a forever home and that a family would be able to adopt her and provide her that stability.

{¶59} "Q. And is that what the Agency believes to be in her best interest, to be placed in the permanent custody of Fairfield County Child Protective Services?

{¶60} "A. Yes." Transcript at 190-191.

{¶61} Ray Barbee, Jr., A.P.'s grandfather, testified that he was an electrical engineer and that he would be able to financially support A.P. if he received custody of her. He testified that he and his wife had not done anything regarding obtaining custody, but that they had let it be known that they would like custody of her if anything came up. He testified that their medical issues had been taken care of. Barbee further testified that he believed that his oldest son had contacted the agency about obtaining custody of A.P., but that he did not know what became of it. He testified that he was financially able and willing to assume legal custody of A.P.

{¶62} Pursuant to an Entry filed on December 13, 2010, the trial court terminated appellant's parental rights and granted permanent custody of A.P. to Fairfield County Child Protective Services. The trial court, in its Entry, found that reasonable efforts had been made by the agency to finalize permanency for A.P. The trial court, in its Findings of Fact and Conclusions of Law filed on December 13, 2010, found that A.P, could not or should not be placed with appellant within a reasonable

time and that it would be in A.P.'s best interest for appellant's parental rights to be terminated.

{¶63} Appellant now raises the following assignments of error on appeal:

{¶64} "I. THE TRIAL COURT ERRED WHEN IT GRANTED THE MOTION OF FAIRFIELD COUNTY CHILD PROTECTIVE SERVICES FOR PERMANENT CUSTODY OF THE MINOR CHILD A.P. AS THE STATE OF OHIO FAILED TO ESTABLISH THE JURISDICTIONAL PREREQUISITES FOR A GRANT OF PERMANENT CUSTODY AS SET FORTH IN R.C. § 2151.414.

{¶65} "II. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT GRANTED THE MOTION OF FAIRFIELD COUNTY CHILD PROTECTIVE SERVICES IN THE ABSENCE OF CLEAR AND CONVINCING EVIDENCE OF THE FACTS REQUIRED BY R.C. § 2151.414.

{¶66} "III. THE TRIAL COURT ERRED WHEN IT FOUND THAT REASONABLE EFFORTS NEED NOT BE EXPENDED TO REUNIFY THE APPELLANT WITH HIS MINOR CHILD PURSUANT TO OHIO REVISED CODE 2151.419 IN ITS JUDGMENT ENTRY DATED APRIL 23, 2009.

{¶67} "IV. FAIRFIELD COUNTY CHILD PROTECTIVE SERVICES PRESENTED INSUFFICIENT EVIDENCE FOR THE COURT TO GRANT LEGAL CUSTODY PURSUANT TO R.C. 2151.353(A)(3) AND THE COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT TO THE EVIDENCE."

{¶68} Because appellant had addressed all of his assignments of error together, we shall do the same.

I, II, III, IV

**{¶69}** Appellant, in his four assignments of error, argues that the trial court erred in terminating appellant's parental rights and granting permanent custody of A.P. to Fairfield County Child Protective Services.  We disagree.

**{¶70}** A trial court's decision to grant permanent custody of a child must be supported by clear and convincing evidence. The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty, as required beyond a reasonable doubt, as in criminal cases." *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, 120 N.E.2d 118; *In re: Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 481 N.E.2d 613.

**{¶71}** In reviewing whether the trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54, 60; See also, *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578. If the trial court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. *Schiebel,* 55 Ohio St.3d at 74.

**{¶72}** Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." *Id.* Issues relating to the credibility of witnesses

and the weight to be given the evidence are primarily for the trier of fact. As the court explained in *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273:

{¶73} "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."

{¶74} Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 1997-Ohio-260, 419, 674 N.E.2d 1159; see, also, *In re: Christian,* Athens App. No. 04CA10, 2004-Ohio-3146; *In re: C. W.,* Montgomery App. No. 20140, 2004-Ohio-2040.

{¶75} R.C. 2151.414 states, in relevant part, as follows: (B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

{¶76} "(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive

twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."

{¶77} Revised Code 2151.414(E) sets forth the factors a trial court must consider in determining whether a child cannot or should not be placed with a parent within a reasonable time. If the court finds, by clear and convincing evidence, the existence of any one of the following factors, "the court shall enter a finding that the child cannot be placed with [the] parent within a reasonable time or should not be placed with either parent":

{¶78} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parent to remedy the problem that initially caused the child to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions that caused the child to be placed outside the child's home. In determining whether the parents have substantially remedied the conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties;* * *…

{¶79} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or

by other actions showing an unwillingness to provide an adequate permanent home for the child;…

{¶80} "(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child…

{¶81} "(16) Any other factor the court considers relevant."

{¶82} The trial court, in the case sub judice, found that appellant had failed repeatedly and continuously to substantially remedy the conditions causing A.P. to be placed outside the home and also found that A.P. could not and should not be placed with appellant within a reasonable time.  Appellant's case plan in this case required him to submit to random drug/alcohol screens and to obtain counseling for drug/alcohol issues.  Appellant, who denied having a substance abuse problem has been arrested twice for drunk driving and has missed numerous random screens for drugs and/or alcohol. Testimony also was adduced that appellant was inconsistent with his counseling and with his visitation with A.P. and, although required to maintain employment as part of his case plan, refused to look for employment other than as an electrician. As noted by the trial court, the only time since June of 2008 when appellant had attended counseling on a more or less consistent basis was in August and September of 2010.

{¶83} The trial court also found that appellant, due to his repeated incarcerations, could not provide care for A.P.  As is stated above, testimony was adduced that appellant had been in jail five times since A.P.'s birth and intentionally violated his probation so that he could finish his jail term. During such time he missed A.P.'s first birthday.  He was not paying child support for her.

**{¶84}** Based on the forgoing, we find that the trial court did not err in finding that appellant had failed continuously and repeatedly to substantially remedy the conditions causing A.P. to be placed outside the home and that A.P. could not and should not be placed in appellant's home within a reasonable time.

**{¶85}** The next issue for determination is whether or not the trial court erred in finding that the A.P.'s best interest would be served by terminating appellant's' parental rights.

**{¶86}** In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

**{¶87}** The Guardian Ad Litem indicated at the hearing that A.P. was doing well with her kinship provider and was thriving. While, as is stated above, A.P.'s paternal grandfather testified that he and his wife were willing and able to take A.P., the Guardian Ad Litem, in her report, noted that the paternal grandparents had not visited with A.P. with any consistency. The Guardian further noted that she was unaware that the paternal grandparents had wanted custody of A.P. until right before the original trial date, which was in September of 2010. The Guardian Ad Litem indicated that she was

concerned that A.P. did not have a strong bond with them. At the conclusion of the trial, the Guardian Ad Litem told the court that she had concerns about appellant's incarceration and the fact that he intentionally violated probation by using drugs just so that he was no longer on probation.  She indicated both on her report and at trial that she thought a grant of permanent custody would be in A.P.'s best interest.

{¶88}  Based on the foregoing, we find that the trial court did not err in finding that A.P.'s best interest would be served by terminating appellant's parental rights.

{¶89}  Appellant, in his third assignment of error, argues that the trial court erred when, in its April 23, 2009, Judgment Entry, it found that reasonable efforts need not be expended to reunify appellant with A.P. pursuant to R.C. 2151.419.  We note that the April 23, 2009, Entry does not state that reasonable efforts need not be expended to reunify appellant with A.P.  Moreover, the Ohio Supreme Court, in 2007, indicated that R.C. 2151.419, the "reasonable efforts" statute, does not generally apply to permanent custody proceedings. See *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816

{¶90}  Finally, appellant, in his fourth assignment of error, argues that the trial court erred in granting legal custody pursuant to R.C. 2151.353(A)(3). R.C. 2151.353(A)(3) states in relevant part: "If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:

{¶91}  "(3) Award legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings..."

{¶92} In the case sub judice, the trial court never granted legal custody to either parent or to any other person. Rather, the trial court granted permanent custody of A.P. to Fairfield County Child Protective Services pursuant to R.C. 2151.414.

{¶93} In short, we find that the trial court's decision terminating appellant's parental rights and granting permanent custody of A.P. to Fairfield County Child Protective Services was not against the manifest weight of the evidence.

{¶94} Appellant's four assignments of error are, therefore, overruled.

{¶95} Accordingly, the judgment of the Fairfield County Court of Common Pleas, Juvenile Division, is affirmed.

By: Edwards, J.

Gwin, P.J. and

Farmer, J. concur

_____

_____

_____

JUDGES

JAE/d0323

[Cite as *In re A.P.*, 2011-Ohio-1909.]

IN THE COURT OF APPEALS FOR FAIRFIELD COUNTY, OHIO

FIFTH APPELLATE DISTRICT

IN THE MATTER OF:    :
           :
   A.P.      :
           :
  (Minor Child)   :   JUDGMENT ENTRY
           :
           :
           :
           :   CASE NO. 10-CA-65

For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Fairfield County Court of Common Pleas, Juvenile Division, is affirmed. Costs assessed to appellant.

_____

_____

_____

         JUDGES