[Cite as *In re W.H.*, 2016-Ohio-8206.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

IN RE:

    W.H.

[LAURA HORN - APPELLANT]
[JAMES WISE, JR. - APPELLANT]

CASE NO. 9-16-19

**O P I N I O N**

---

IN RE:

    H.W.

[LAURA HORN - APPELLANT]
[JAMES WISE, JR. - APPELLANT]

CASE NO. 9-16-20

**O P I N I O N**

---

IN RE:

    J.W., III

[LAURA HORN - APPELLANT]

CASE NO. 9-16-21

**O P I N I O N**

---

IN RE:

    J.W.,

[LAURA HORN - APPELLANT]
[JAMES WISE, JR. - APPELLANT]

CASE NO. 9-16-22

**O P I N I O N**

---

IN RE:

    P.W.

[LAURA HORN - APPELLANT]
[JAMES WISE, JR. - APPELLANT]

CASE NO. 9-16-23

**O P I N I O N**

IN RE:

    E.W.

CASE NO.  9-16-24

[LAURA HORN - APPELLANT]             O P I N I O N
[JAMES WISE, JR. - APPELLANT]

IN RE:

    J.W., IV

CASE NO.  9-16-25

[LAURA HORN - APPELLANT]             O P I N I O N
[JAMES WISE, JR. - APPELLANT]

**Appeals from Marion County Common Pleas Court
Juvenile/Family Division
Trial Court Nos. 2013AB00219, 2013AB00220, 2013AB00221, 2013AB00222,
2013AB00241, 2013AB00242 and 2013AB00243**

**Judgments Affirmed**

**Date of Decision:    December 19, 2016**

**APPEARANCES:**

    *Nathan D. Witkin* **for Appellant-Father**

    *Robert C. Nemo* **for Appellant-Mother**

    *Justin J. Kahle* **for Appellee**

**SHAW, P.J.**

{¶1} Mother-Appellant, Laura Horn ("Mother"), and Father-Appellant, James Wise, Jr. ("Father"), appeal the March 28, 2016 judgments of the Marion County Court of Common Pleas, Family Division, granting the motion for permanent custody of their seven children filed by Marion County Children Services (the "Agency") and terminating their parental rights. On appeal, Appellants claim that the trial court erred in granting the Agency's motion for permanent custody because the Agency failed to use reasonable efforts and diligent case planning toward their reunification with the children. Appellants also allege that the guardian ad litem provided ineffective assistance of counsel to the children and prejudiced their case. The Appellants further assert that the trial court's decision to grant the Agency's motion for permanent custody was not supported by competent, credible evidence and was against the weight of the evidence.

{¶2} On October 28, 2013, the Agency filed complaints and motions for emergency temporary custody of Appellants' children, W.H. (born October 2007), H.W. (born September 2008), J.W. III (born July 2010), and J.W. (born November 2012).[1] The Agency claimed that the children were dependent pursuant to R.C. 2151.04(C) on the basis that "[t]he home is infested with roaches. Caseworker

---

[1] We note that another child, D.W., was included in this motion, but the record reveals that he is the son of Father and another woman, Jennifer E. D.W. went to live with Jennifer E. as a result of these proceedings. Therefore, D.W. was not included in the Agency's permanent custody motion and is not part of this appeal.

observed roaches all over the walls, floors, refrigerator, and on containers of food. Caseworker also observed the two youngest children in a pack-n-play where roaches were crawling." [2]  (Oct. 28, 2013 Compl.)  The trial court granted the Agency's motion for emergency temporary custody, appointed counsel for Appellants, and appointed a guardian ad litem for the children.  The children were placed in a foster home and Appellants were given weekly supervised visitation with the children at the Agency.

{¶3} The Agency filed a case plan delineating objectives and goals for facilitating Appellants' reunification with the children, with the primary concern being the Appellants' ability to remediate the environmental hazards in the home and maintain appropriate housing for the children.  Both Mother and Father were given a list of specific case plan objectives to accomplish, which included, among other things, completing substance abuse and mental health screenings and following the recommendations from those screenings, keeping their home free of environmental hazards and allowing the county department of health to complete inspections of the home, completing parenting classes, including learning about the effects of cockroach infestations on young children, and not permitting anyone to

---

[2] The record also indicates that the impetus for the Agency's investigation prompting the filing of these complaints came from an anonymous tip stating that the children were being physically abused by the parents, the home was infested with cockroaches, the parents were not nurturing the children, there was traffic in and out of the home, there was marijuana in the home, the children witnessed a domestic violence incident between Father and an unknown male resulting in an injury to Father, Appellants snort pills in front of the children, and the children do not have beds.

live in the home other than Appellants. Father was also given the task of completing a domestic violence screening based upon an alleged history of domestic violence.

{¶4} On November 15, 2013, the trial court held a shelter care hearing and ordered that the children remain in the temporary custody of the Agency.

{¶5} On December 30, 2013, the Agency filed another motion for emergency temporary custody this time concerning a set of triplets, P.W., E.W., and J.W. IV, born to Appellants in early December 2013, and alleging that the children were dependent pursuant to R.C. 2151.04(C). In the motion, the Agency alleged that Appellants had failed to remediate the cockroach infestation, which prompted the removal of the other four children from their home. The Agency further stated that the triplets had been released from the hospital on apnea monitors, which required sanitary conditions. The Agency noted that Appellants' visitation with the triplets had been sporadic in the hospital, and that they had not received training to use the apnea monitors or to dispense the triplets' medications.

{¶6} The Agency also expressed concern with Appellants' general ability to meet the medical needs of the triplets, who were born premature, and highlighted examples in which Appellants had failed to meet the medical needs of the other four children removed from Appellants' home in October of 2013. The trial court granted the Agency's motion and placed the triplets in the temporary custody of the

Agency. The trial court subsequently approved the Agency's case plan, which incorporated the triplets.

{¶7} On January 24, 2014, the parties appeared before a Magistrate for an adjudication hearing, where the following testimony relative to the Agency's complaints was presented.

{¶8} Jerry Marquis, a code enforcement officer with the Marion Public Health Department testified that prior to being notified by the Agency, he had been to Appellants' home regarding a report of solid waste situated around the house. However, he did not conduct an inspection of the interior of the home until a formal complaint was made by the Agency in November 2013 relative to this case. During his inspection, Mr. Marquis recalled assessing numerous violations, including cockroaches dead and alive throughout the home, various structural problems, general uncleanliness and unsanitary issues, no running water or toilet facilities, no kitchen sink or suitable food preparation area and a collapsed roof in the kitchen, and the vent from the hot water heater not allowing for proper ventilation of carbon monoxide.

{¶9} Mr. Marquis discussed pictures he took depicting the condition of Appellants' home on November 13, 2013, which showed a large amount of trash and tires scattered throughout the interior and exterior of the home, deteriorating floors, structurally unstable stairs, unsecured electrical switches/outlets creating an

electrocution hazard if touched, nonfunctional toilets filled with human waste, several uncovered five gallon buckets filled with human waste placed throughout the home, soiled mattress piled on garbage, along with evidence of the cockroach infestation. He explained that he informed Father of the repairs that need to be made and gave him a written notice of the violations, but "was not met with real good reception" as Father became confrontational with him. (Jan. 24, 2014 Adjudication Hrg. at 6).

{¶10} Mr. Marquis returned to Appellants' home on December 28, 2013, and recalled that Father continued to be confrontational, preventing him from inspecting most of the home. Father was given another written notice of the violations. Mr. Marquis did note that the home had running water at the time, however, there was no improvement made with the dilapidated stairs and the electrical safety concerns.

{¶11} On January 6, 2014, Mr. Marquis returned to Appellants' home a third time and no significant improvement had been made. He delivered a "Notice To Abate Nuisance and/or Violation" and informed Appellants that they would be given five days to correct the violations before the matter would be taken to the Board of Health. (State's Ex. C). On January 14, 2014, Mr. Marquis followed up on the violations contained in the Notice. He explained that Father answered the door and told him that some of the repairs had been made. Mr. Marquis was not able to enter the home due to Father's confrontational attitude. Mr. Marquis

returned to deliver a notice declaring the home uninhabitable, deeming the home unsuitable for human habitation, and giving Appellants ten days to vacate the home. Appellants were instructed to contact the county department of health when the violations were corrected and to provide documentation that a certified electrician and plumber had made the necessary repairs. Mr. Marquis testified that since then Appellants have not contacted the department of health or provided him with the necessary paperwork. Accordingly, Mr. Marquis testified that Appellants' home was still deemed uninhabitable at the time of the adjudication hearing.

{¶12} Mandy Davis, the Agency's investigator involved in the children's removal from the home, provided testimony recalling that the Agency's initial involvement was due to allegations of a roach infestation and drugs being sold out of the home. Ms. Davis provided similar testimony as Mr. Marquis describing the interior of the home and noted that "[t]here were thousands of roaches everywhere. There were roaches, you know, on the food that was sitting on the counters, there was roaches on the fridge, in the playpen with the kids. When I arrived the kids were actually playing a game called "squash the roach" with a fly swatter * * *." (Jan. 24, 2014 Adjud. Hrg. at 34). She also described roach bites all over the children's hands and ears.

{¶13} Karena Pryor, the Agency's ongoing caseworker handling the case, testified that when the triplets were born in December 2013, the Agency did not

think it was appropriate for the newborns to be placed in Appellants' home. Ms. Pryor explained that the triplets were six weeks pre-mature and needed around the clock care because they were on apnea monitors and medication.

{¶14} On March 6, 2014, after conducting an independent review, the trial court approved and adopted the Magistrate's decision finding the children to be dependent.

{¶15} On April 4, 2014, the trial court held a dispositional hearing and ordered that the children remain in the temporary custody of the Agency and that the parties follow the case plan.

{¶16} Throughout the case, the Agency filed a series of semi-annual reviews which indicated Appellants had made insufficient progress in meeting the case plan objectives. Appellants' eventually completed the initial substance abuse and mental health assessments after several months of the case pending. However, the Agency noted that Father refused to follow the counseling center's recommendation of participating in group drug treatment and of completing drug screens at the counseling center. The record indicates that Father did agree to complete drug screens for the Agency's caseworker. There were two drug screens done by the Agency in August and October 2014. Father tested positive for marijuana, cocaine, benzoylecgonine (a metabolite of cocaine), and ecgonine methyl ester (a metabolite of cocaine) on both occasions. Father completed two more drug screens in January

2015 and February 2015. The results of which indicated him testing positive for THC and opiates, and THC, respectively. Father refused to submit to a domestic violence assessment and refused to take parenting classes, stating to the Agency's caseworker that he knows how to parent his children and there is nothing the classes would be able to teach him. Father also had not learned of the effects of cockroaches on young children.

{¶17} The record indicated that Mother received SSI due to a disability which rendered her low functioning. She had completed the initial substance abuse and mental health screenings, but was inconsistent in complying with drug screens. The record indicates that a drug screen for Mother in 2014 was positive for hydromorphone, with no prescription provided to the caseworker, and again positive for hydrocodone, this time with a prescription for Cyclobenzaprine provided to the caseworker. Mother had also failed to complete parenting classes or to educate herself of the effects of cockroaches on small children. The caseworker noted in each semi-annual review, that even though Father and Mother claimed to be the only ones living in the home, there were always other people in the home when she visited.

{¶18} The record establishes that the children were placed together in two different foster homes. W.H., H.W., J.W. III, and J.W. were together in one home and the triplets were in another. As the case progressed, it became evident to the

Agency that Appellants had not been meeting the developmental needs of the four older children removed from their home in October 2013.

{¶19} Specifically, since the removal of the children from Appellants' home, the Agency learned that the oldest child, W.H., had been diagnosed with epilepsy and had problems with his speech, the next oldest, H.W., suffered from seizures, was not toilet trained, had problems with her speech, and was also subject to chronic urinary tract infections. It was later discovered that H.W. had three kidneys and kidney disease, which resulted in her undergoing surgery while the case was pending. There was no indication that Appellants had been addressing these medical concerns or ensuring that the children were taking the proper medication.

{¶20} The Agency also discovered that J.W. III had been referred to a specialist when he was five-months-old for possible hip dysplasia, however no action was taken by Appellants. While it was discovered through x-rays that J.W. III's hips were normal, it was also revealed that he had a large skin tag removed from his face which was causing him distress. J.W. III also had issues with his speech and was not taken to an early intervention specialist by Appellants despite qualifying for the services.

{¶21} J.W., the youngest of the four children removed from Appellants' home, had a large mole or birthmark on his back that was supposed to be monitored by a dermatologist every six months for growth or possible cancerous changes.

However, the record indicates that Appellants had not taken him to the doctor to address this while he was in their care. J.W. was also prescribed glasses and was receiving speech therapy.

{¶22} While in the Agency's temporary custody, the children were assessed by the appropriate health care providers and placed on a treatment plan to remedy their developmental delays and to address the untreated medical conditions. According to the semi-annual reviews, all the children had made significant progress while in foster care. The case reviews further noted that Appellants had attended less than half of the scheduled visitations with the children.

{¶23} In March of 2015, Mother gave birth to a set of twins, who tested positive for barbiturates at the time of their birth. Notably, these children are not part of this case.

{¶24} On May 29, 2015, the Agency filed motions requesting permanent custody of the children based upon Appellants' failure to substantially remedy the conditions which led to the children's removal from the home and their continued placement in the Agency's temporary custody. The Agency also cited the children's need for a permanent and stable home as an additional reason supporting their request that its motion for permanent custody of the children be granted.[3]

---

[3] We note that Father is not the biological father of W.H. and that the identity of W.H.'s father was unknown. Nevertheless, the record establishes that notice to W.H.'s father of the Agency's motion for permanent custody was made by publication.

**{¶25}** On December 7, 2015, the guardian ad litem filed a report recommending that the Agency be "awarded custody of said children." (GAL December 7, 2015 report at 4).

**{¶26}** On December 7, 2015, March 1, 2016, and March 10, 2016, the trial court held hearings on the Agency's motion for permanent custody. Several witnesses testified for the Agency, including the county code enforcement officer from the department of health, counselors from Marion Area Counseling Center, the Agency's ongoing caseworker, the Agency's visitation monitor, and the guardian ad litem. The testimony at the hearing revealed the following.

**{¶27}** Mary Riley, a treatment specialist at the Marion Area Counseling Center, recalled seeing Father for one session in August of 2014. She explained that at that point Father's alcohol and other drug assessment had been completed and she was meeting with him to establish a treatment plan. However, a treatment plan was never created due to Father abruptly leaving the session after twenty minutes because he refused to take a drug test. She explained that the drug screening was necessary to determine a baseline of drug use so that a treatment plan could be tailored to his needs. She recalled Father stating his belief that drug tests were unconstitutional, getting up, and slamming the door on his way out. Father did not return to the counseling center after this initial meeting.

{¶28} Irene Johnson, a mental therapist at the Marion Area Counseling Center, testified that she met with Mother for one individual counseling session in July of 2014. She explained that Mother completed an alcohol and other drugs assessment and that no substance abuse treatment was recommended. However, Mother was referred to her for mental health counseling due to depression, but no treatment was recommended after the session.

{¶29} Jerry Marquis, Code Enforcement Officer with the Marion County Department of Health, reiterated much of the same testimony given at the adjudication hearing regarding the condition of the home at the time of the four older children's removal and the Agency's initial involvement leading to up the Board of Health's decision to declare the home uninhabitable in January of 2014. Mr. Marquis next visited the home in April of 2014 and noted that some improvement was made, but the home was still inhabitable at that time.

{¶30} Mr. Marquis then visited in July of 2014 and observed the kitchen was remodeled, with the siding and the roof fixed, but still noted quite a bit of solid waste around the home. Mr. Marquis again visited the home in September of 2014. He determined that the majority of the necessary repairs had been completed and removed the uninhabitable placard. He returned to view the home in June 2015 prior to a hearing, but was unable to gain entry due to Father's volatility toward him. Despite being prevented from inspecting the interior of the home, he observed an

increase of solid waste and garbage in the yard. He took pictures of the outside of the home in July, August, and November 2015, and noted a decline in the home's overall outward condition, with an increase in the amount of waste and garbage in the yard, and the continued dilapidation of the front porch steps. At the time of the December 2015 permanent custody hearing, Mr. Marquis reported that the current condition of the home had worsened to the point that he was considering initiating the process to deem the home uninhabitable again.

**{¶31}** Karena Pryor, the Agency's ongoing caseworker assigned to the case, testified that the original removal of the four oldest children was due to the condition of Appellants' home and that the triplets were removed because the condition of the home had not improved at the time of their birth. Ms. Pryor discussed the case plan put into effect to facilitate the children's reunification with Appellants. She explained that with regard to Father, the case plan was developed to address the Agency's concerns of Father's history of domestic violence, his chronic marijuana use, and his need for parenting classes due to the condition of the home. She recalled that Father completed an alcohol and other drug assessment, but that Father had not been cooperative with following up with the counseling center or with submitting to drug screens as directed by the case plan.

**{¶32}** Ms. Pryor attempted to make contact with Appellants at least once a month, but Appellants only met with her sporadically. She explained that in the six

months leading up to the permanent custody hearing, Appellants had stopped all together trying to make an effort to meet with her. When she did meet with Appellants at their home, it was mainly on the front porch because Appellants did not want her inside. After the Spring of 2015, Appellants did not let her in the home to assess its suitability for the children. She testified that Father had yet to complete a domestic violence screening because he saw no need for it. According to the case plan, Father was also supposed to complete parenting classes, explore suitable housing options, and allow the department of health into the home to do inspections.

{¶33} Ms. Pryor testified that Mother had not completed parenting classes and neither parent had learned about the effects of roaches on young children. Ms. Pryor's inability to see the interior of the home impeded her assessment of whether Appellants had complied with the case plan objectives. For example, she could not make a determination of whether the housing was suitable, if Appellants could provide for the children's basic needs, or who was living in the home. Ms. Pryor noted throughout the semi-annual reviews that there were always numerous other individuals at the home when she visited despite the fact that Appellants maintained they were the only ones living there.

{¶34} Appellants were also supposed to maintain the minimum utilities of water, electric, and heat in the home. Ms. Pryor recalled that at the March 2016 permanent custody hearing, the Appellants had admitted that their home did not

have running water. Ms. Pryor believed Appellants' lack of cooperation in allowing the home to be assessed for its appropriateness for the children hindered Appellants' progress towards reunification with the children. She expressed her belief that Appellants had not demonstrated an ability to provide for the children's basic needs and that the children needed permanency which Appellants could not provide.

{¶35} Angie Johnson, a case aide who supervises visitation at the Agency, testified to observing Appellants' visitation with the four older children since November of 2013, and with the triplets after their birth in December 2013. The last visit she observed took place on August 4, 2015. The visit with the triplets occurred first and she described Appellants' interaction with the nearly two-year-old triplets as appropriate, playful, and nurturing. With regard to the visit with the older children, Ms. Johnson noted that only three of the children attended because one was at camp.

{¶36} In general, she described seeing a strong bond between Appellants and the four older children. However, she did not describe the same bond present with the triplets and observed that the triplets appear not to comprehend that Appellants were their biological parents. Ms. Johnson explained that Appellants had missed numerous visits over the duration of the case and were placed on a mandatory call ahead policy, which required Appellants to call the Agency and confirm they intended to visit that day in order for a visitation to take place. She explained that

this policy is to ensure the parents show up for the visitation so as not to put the children through the disappointment of waiting at the Agency only to have no one arrive.

{¶37} The Agency submitted two documents exhibiting the Appellants' visitation summary for each group of children, the four older children and the triplets. As for the four older children, the summary spanned the timeframe of November 1, 2013 to February 23, 2016, about a week before the last permanent custody hearing where Ms. Johnson's testimony was presented. The visitation summary with the triplets began on March 25, 2014 and also ended on February 23, 2016. Both summaries demonstrated that Appellants had not visited with the children since August 4, 2015, despite a weekly visitation schedule being in place and Appellants were either a "no call or no show" for nearly thirty appointments since their last visit. (State's Exs. 12 and 13, March 1, 2016 Hrg. at 84).

{¶38} According to Ms. Johnson, Appellants attended 39 of the 123 visitations scheduled with the four older children. She acknowledged that three of those visitations were cancelled by the Agency. As for the triplets, Appellants attended 22 out of 111 scheduled visits, with the Agency being responsible for three cancellations. The visitation summaries for the four older children and triplets showed a similar pattern of Appellants' attending nearly half the visitations in the

beginning of the case with a sharp drop off in visitations during the early part of 2015.

**{¶39}** The guardian ad litem for the children testified and also agreed that permanent custody was in the children's best interest.

**{¶40}** On March 28, 2016, the trial court issued judgment entries granting the Agency's motion for permanent custody of the children. In its judgment entries, the trial court made findings of facts and found by clear and convincing evidence that the children cannot be placed with the parents in a reasonable period of time or should not be placed with the parents in accordance with the factors contained in R.C. 2151.414(E)(1)-(16). The trial court also found that granting the Agency's motions for permanent custody was in the best interest of the children.

**{¶41}** Both Mother and Father filed appeals from the trial court's judgments granting the Agency permanent custody of the children, and asserted the following assignments of error on appeal.[4]

### MOTHER'S ASSIGNMENT OF ERROR I

**THE TRIAL COURT ERRED IN FINDING THAT GRANTING PERMANENT CUSTODY OF APPELLANT'S CHILDREN TO APPELLEE WAS IN THE BEST INTEREST OF THE CHILDREN.**

---

[4] We note, for reasons not apparent from the record, that Father failed to file a notice of appeal in case no. 9-16-21 regarding the trial court's disposition of the case as to J.W. III. However, due to the over lapping nature of mother's and father's assignments of errors, this oversight is not determinative to the outcome of J.W. III's case on appeal.

**MOTHER'S ASSIGNMENT OF ERROR II**

**THE GUARDIAN AD LITEM RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO PERFORM A THOROUGH INDEPENDENT INVESTIGATION.**

**FATHER'S ASSIGNMENT OF ERROR I**

**THE TRIAL COURT ABUSED ITS DISCRETION BY NOT STRIKING THE GUARDIAN'S REPORT AND TESTIMONY AS NOT BEING COMPETENT, CREDIBLE EVIDENCE.**

**FATHER'S ASSIGNMENT OF ERROR II**

**THE TRIAL COURT ABUSED ITS DISCRETION BY FOLLOWING THIS RECOMMENDATION AND NOT DISCHARGING THE GUARDIAN UNDER R.C. 2151.281(D).**

**FATHER'S ASSIGNMENT OF ERROR III**

**THE TRIAL COURT COMMITTED PLAIN ERROR IN FAILING TO ASCERTAIN THE WISHES OF THE CHILD OR SPECIFICALLY CONSIDER THE BEST INTEREST FACTORS IN R.C. 2151.414(D).**

**FATHER'S ASSIGNMENT OF ERROR IV**

**THE TRIAL COURT ABUSED ITS DISCRETION BY FINDING THAT MARION COUNTY CHILDREN SERVICES MADE REASONABLE EFFORTS TO RETURN THE CHILDREN TO THE PARENTS.**

**FATHER'S ASSIGNMENT OF ERROR V**

**THE TRIAL COURT'S DECISION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE APPELLEE DID NOT PROVE BY CLEAR AND CONVINCING EVIDENCE THAT THE COURT SHOULD GRANT ITS MOTION FOR PERMANENT CUSTODY OF THE MINOR CHILDREN.**

**FATHER'S ASSIGNMENT OF ERROR VI**

**THE CASE PLAN IN THIS MATTER DID NOT FOLLOW THE GENERAL GOALS AND PRIORITIES OF R.C. 2151.412(H).**

{¶42} For ease of discussion we elect to discuss some of Appellants' assignments of error together and out of order.

*Evidence Supporting the Trial Court's Decision*

{¶43} In Mother's first Assignment of Error and Father's third and fifth Assignments of Error, Appellants argue that the trial court's decision to grant the Agency's motion for permanent custody is not supported by sufficient evidence and is against the manifest weight of the evidence. In making this argument, Father also contends that the trial court failed to make certain required findings.

*Standard of Review*

{¶44} A trial court's decision to grant permanent custody of a child must be supported by clear and convincing evidence. The Supreme Court of Ohio has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty, as required beyond a reasonable doubt, as in criminal cases." *Cross v. Ledford*, 161 Ohio St. 469 (1954),

paragraph three of the syllabus; *In re: Adoption of Holcomb*, 18 Ohio St.3d 361, 370 (1985).

**{¶45}** In reviewing whether the trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990); *See also*, *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. If the trial court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. *Schiebel*, 55 Ohio St.3d at 74.

**{¶46}** Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." *Schiebel*, 55 Ohio St.3d at 74. Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997); *See also*, *In re: Christian*, 4th Dist. Athens No. 04CA10, 2004-Ohio-3146, ¶ 7; *In re: C.W.*, 2d Dist. Montgomery No. 20140, 2004-Ohio-2040, ¶ 17.

{¶47} Section 2151.414(B)(1) of the Revised Code sets forth a two-pronged test for a trial court granting an Agency's motion for permanent custody. The court may grant permanent custody of a child to the movant if the court determines that it is in the best interest of the child to grant permanent custody to the agency that filed the motion for permanent custody and that any of the following apply:

> **(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and _the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents_.**

> **(b) The child is abandoned.**

> **(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.**

> **(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.**

> **(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been**

> **adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.**

R.C. 2151.414(B)(1) (emphasis added).

**{¶48}** In this case, the trial court made findings pursuant to R.C. 2151.414(B)(1)(a), specifically considering "whether the children cannot be placed with the parents in a reasonable period of time and should not be placed with their parents * * *." (Mar. 28, 2016 JE at 6). Section 2151.414(E) of the Revised Code sets forth the factors a trial court must consider in determining whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents. Here, the trial court determined the following factors in R.C. 2151.414(E) to be relevant to its determination in this case:

> **(E)  In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. *If the court determines, by clear and convincing evidence*, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code *that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent*:**

> **(1)  Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's**

**home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

**\* \*\***

**(4)   The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**

**\* \*\***

**(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.**

{**¶49**} R.C. 2151.414(E) (emphasis added).  The trial court stated the following in its judgment entry regarding these factors:

**The Court finds by clear and convincing evidence that the Agency provided over two years of case planning and made diligent and reasonable efforts to assist the parents to remedy the problems that caused the children to be placed outside the home.  The Court further finds by clear and convincing evidence that the parents failed continuously and repeatedly to substantially remedy the conditions that caused the children to remain in the Agency's custody.**

**Pursuant to Ohio Revised Code § 2151.414(E)(4) the Court finds by clear and convincing evidence the parents demonstrated a lack of commitment to the children by failing to regularly support, visit or communicate with the children when able to do so. Specifically the parents repeatedly failed to provide a safe and**

> **habitable home for the children.  Also see Ohio Revised Code §
> 2151.414(E)(14).**

(Mar. 28, 2016 JE at 7).

**{¶50}** The record supports the trial court's findings that these factors are relevant to the disposition of this case.  The uncontroverted evidence establishes that the conditions causing the children to be placed outside Appellants' home were the unsanitary and dangerous state of Appellants' home, which also led the county department of health to deem the home uninhabitable.  Even though Appellants had made some progress in remedying the conditions of the home, enough for the county code enforcement officer to remove the uninhabitable placard in the Fall of 2014, the only evidence in the record indicates that the condition of the home began to deteriorate to the point to where the county code enforcement officer discussed initiating the process to deem the home uninhabitable again in December 2015. Notably, the case plan specifically required that Appellants permit the county code enforcement officer into their home for inspections.  However, Appellants' repeated conduct in refusing admittance to the county code enforcement officer into the house to assess the conditions of the home only served to buttress the Agency's position that Appellants had made insufficient progress in remedying the deplorable conditions to make the home suitable for the children's return.  *See* R.C. 2151.414(E)(1), (14).

{¶51} Moreover, the uncontested evidence in the record establishes that the Agency set up weekly supervised visitations for Appellants to visit with the children. However, in the over two-and-a-half-year period that the children were in the temporary custody of the Agency, Appellants attended 39 of the 123 scheduled visits with the four older children and attended only 22 of the 111 scheduled visits with the triplets. The reports from the Agency's visitation monitor, which were admitted at the permanent custody hearing, demonstrated that Appellants failed to exercise a single visitation with the children from August 2015 to February 2016, and that Appellants' attendance in visitations prior to that time was inconsistent and sporadic. *See* R.C. 2151.414(E)(4).

{¶52} In addition to the finding that the children should not be placed with Appellants or cannot be placed with Appellants in a reasonable period of time, the trial court must also make a determination as to whether granting the Agency's motion for permanent custody is in the children's best interest. In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates that the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due

regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody. We note that the focus of the "best interest" determination is upon the child, not the parents—specifically R.C. 2151.414(C) prohibits the court from considering the effect a grant of permanent custody would have upon the parents.

**{¶53}** It is well-established that "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re C.H.*, 5th Dist. Stark No. 2016CA00081, 2016-Ohio-5202, ¶ 41 citing *In re Mauzy Children*, 5th Dist. Stark No.2000CA00244, (Nov. 13, 2000), quoting *In re Awkal*, 95 Ohio App.3d 309, 316 (8th Dist.1994).

**{¶54}** In the present case, the trial court's decision indicates that it considered the best interest factors and the record supports the trial court's finding that granting the Agency's motion for permanent custody is in the children's best interests. As noted by the trial court in its judgment entries granting permanent custody, the record illustrates that Appellants' failed to attend to the four older children's serious medical conditions or to address their developmental delays while the children were in Appellants' care. The record suggests that some of the medical

conditions and concerns were bought to Appellants' attention, but were ignored. However, after being in the Agency's temporary custody for just a short while and having services provided to address the children's medical and developmental needs, the record indicates that the children had made significant progress in overcoming these issues and even began to thrive.

{¶55} The record also demonstrates that while Appellants appeared to have a strong bond with the four older children, a similar bond with the triplets was absent due to: the triplets being placed in the Agency's temporary custody shortly after their birth; Appellants' subsequent poor visitation attendance; and the triplets' tender age and inability to understand that Appellants are their biological parents.

{¶56} We note that Father argues on appeal that the trial court failed to ascertain the wishes of the children in its best interest determination. The record establishes that at the time of the permanent custody hearing the children were ages eight, seven, five, three and two. The guardian ad litem testified at the permanent custody hearing that due to the children's immaturity he was not able to determine their wishes, but opined that the children appeared to be very well adjusted in their current placement with the Agency. Notably, in making his complaint, Father has failed to point us to any evidence in the record contradicting the guardian ad litem's assessment.

{¶57} In sum, the overarching concerns with the persistent unsanitary and hazardous conditions in Appellants' home, along with Appellants' refusal to cooperate with the Agency and other authorities in remediating the conditions causing the children to be placed outside the home, Appellants' lack of attentiveness to serious medical and developmental concerns with the four older children, and Appellants' failure to regularly attend visitation with the children all support the Agency's position that the children were in need of a legally secure permanent placement, which could not be achieved without a grant of permanent custody. Accordingly, we find the trial court's determinations that the children could not and should not be returned to Appellants and that the grant of permanent custody is in the best interests of the children are supported by sufficient evidence and are not against the manifest weight of the evidence. Mother's first assignment of error and Father's third and fifth assignments of error are overruled.

*The Agency's Reasonable Efforts and Case Plan*

{¶58} In Father's fourth assignment of error, he argues that the record does not support the trial court's conclusion that the Agency made reasonable efforts to prevent the continued removal of the children from Appellants' home. In Father's sixth assignment of error, he argues that the Agency failed to attempt to find family-placement options before placing the children in foster care, contrary to the requirements of R.C. 2151.412(H).

-30-

{¶59} Section 2151.419(A)(1) of the Revised Code governs reasonable efforts by a public children services agency "to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." The agency has the burden of proving that it has made those reasonable efforts. *In re B.P.*, 3d Dist. Logan No. 8-15-07, 2015-Ohio-5445, ¶ 39.

{¶60} " 'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.' " *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. " 'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *Id.*, quoting *In re M.A.P.*, 12th Dist. Butler Nos. CA2012-08-164 and CA2012-08-165, 2013-Ohio-655, ¶ 47.

{¶61} " 'Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and diligent under the circumstances of this case.' " *In re A.M.A.*, 3d Dist. Crawford No. 3-13-02, 2013-Ohio-3779, ¶ 29, quoting *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53, and 5-02-54, 2003-Ohio-1269, ¶ 10. "We

also note that the statute provides that in determining whether reasonable efforts were made, the child's health and safety is paramount."  *Id*., citing R.C. 2151.419(A)(1).

**{¶62}** In its judgment entries granting permanent custody, the trial court found "pursuant to Ohio Revised Code § 2151.419(A)(1) that the Agency made reasonable efforts to prevent the removal of the children from the home of their parents, eliminate the continued removal of the children from their parents' home and taken steps to make it possible for the children to be returned home safely. However [the] parents' failure to work with the Agency in achieving the goals and objectives of the case plan in this regard prevented return of the children to the parents' home."  (March 28, 2016 JE at 7).  As previously discussed at length, the record accurately reflects the trial court's finding as to reasonable efforts.

**{¶63}** Nevertheless, Father seems to primarily take issue with the fact that Appellants were not given increased visitation with the children when their home was deemed inhabitable by the county code enforcement officer in the Fall of 2014. Despite the fact that the county code enforcement officer had removed the uninhabitable placard at this time, indicating only that Appellants had taken the minimal steps to remedy the atrocious conditions to make the home suitable for human habitation at its basic level, Appellants had still not complied with case plan objectives which required them to complete parenting classes and educate

-32-

themselves about the effects of cockroach infestations on small children. Nor had Appellants regularly attended the scheduled visitations with the children at the Agency or demonstrated in any way to the Agency their ability to provide the most basic and fundamental support for the children.

{¶64} The record also demonstrates that during the initial phases of the case, the Agency attempted to find alternative housing for Appellants, but Father became agitated by the idea and insisted in staying in the home, which at the time belonged to his father. Thus, the Agency's assistance in finding Appellants an appropriate home free of environmental and structural hazards—which was the undisputed cause of the children's removal from the home—was never pursued due to Appellants' unwillingness to find alternative housing.

{¶65} The Agency also moved times and dates around to make visitation easier on Appellants. Ms. Johnson, the visitation monitor, recalled Appellants had a hard time getting transportation to the Agency, and that it is the Agency's policy not to remove children from school for visitation. The Agency merged the visitation schedules with the two groups of children to accommodate Appellants so that they could visit with the triplets earlier and see the older children after school. The Agency also offered to provide bus tickets and cab vouchers to Appellants to help them get to the visitations.

**{¶66}** Given the evidence in the record supporting the trial court's determination that the Agency used reasonable efforts to eliminate the continued removal of the children from Appellants' home, or to make it possible for the children to return safely home, and nothing in the record to support Father's criticism of the Agency's conduct, we do not find merit in Father's fourth assignment of error.

**{¶67}** Father also claims the Agency's case plan was deficient because it failed to comply with R.C. 2151.412(H) setting forth "general priorities" by which an agency "shall" be guided in developing a case plan. *See In re A.J.*, 5th Dist. Licking No. 14-CA-35, 2014-Ohio-3755, ¶¶ 20-21. The portion of R.C. 2151.412(H) relevant to Father's argument addresses who "should" have custody of a child:

> **(H) In the agency's development of a case plan and the court's review of the case plan, the child's health and safety shall be the paramount concern. The agency and the court shall be guided by the following general priorities:**
>
> **(1) A child who is residing with or can be placed with the child's parents within a reasonable time should remain in their legal custody even if an order of protective supervision is required for a reasonable period of time;**
>
> **(2) If both parents of the child have abandoned the child, have relinquished custody of the child, have become incapable of supporting or caring for the child even with reasonable assistance, or have a detrimental effect on the health, safety, and best interest of the child, the child should**

-34-

**be placed in the legal custody of a suitable member of the child's extended family;**

**(3)   If a child described in division (H)(2) of this section has no suitable member of the child's extended family to accept legal custody, the child should be placed in the legal custody of a suitable nonrelative who shall be made a party to the proceedings after being given legal custody of the child;**

**(4)   If the child has no suitable member of the child's extended family to accept legal custody of the child and no suitable nonrelative is available to accept legal custody of the child and, if the child temporarily cannot or should not be placed with the child's parents, guardian, or custodian, the child should be placed in the temporary custody of a public children services agency or a private child placing agency * * *.**

R.C. 2151.412(H)(1), (2), (3), (4). "Ohio courts have consistently recognized that the language of R.C. 2151.412(H) is precatory, not mandatory." *In re C.C.*, 3d Dist. Marion Nos. 9-16-07, 9-16-08, 2016-Ohio-6981, ¶ 17; *In re A.J.*, 5th Dist. Licking No. 14-CA-35, 2014-Ohio–3755, ¶ 21, quoting *In re M.H.*, 4th Dist. Vinton No. 11 CA683, 2011–Ohio–5140, ¶ 44–45.

{¶68} Contrary to Father's argument on appeal, the Agency's caseworker repeatedly noted in the case plans that no suitable kin had been identified that were able to care for the children. The record demonstrates that it was initially noted in the case plan that the Agency was asked about a potential kinship placement, but Appellants denied any relationship with that individual. Father points to this exchange with an unidentified woman at the shelter care hearing in November of

2013, shortly after the case was initiated, to suggest that the Agency failed to adequately explore kinship options.

> **The Court: Ma'am?**
>
> **Unidentified Female: I'm the grandma of [H.W.], [J.W. III], [J.W.]—and I would like to be able to visit my grandchildren. Is there any way possible that I can do that?**
>
> **The Court: This procedure's only in regards to the parents.**
>
> **Unidentified Female: Okay. I thought I'd just ask.**
>
> **The Court: At some point in time maybe in the, you know, in the future we can let—you may want to talk to a lawyer about what kind of rights you have as a grandparent.**

(Nov. 15, 2013 Hrg. at 10).

**{¶69}** Notably, there was no motion for legal custody filed by a relative or other potential caregiver in this case. Moreover, this exchange with the trial court alone does not demonstrate that the Agency failed to comply with the guidelines set forth in R.C. 2151.412(H). Accordingly, we are not persuaded by Father's argument that the Agency's case plan was deficient in this manner. Therefore, Father's fourth and sixth assignments of error are overruled.

*The Guardian Ad-Litem*

**{¶70}** In Mother's second assignment of error and Father's first and second assignments of error, Appellants claim the trial court erred in overruling trial counsel's motion to strike the guardian's report and in not discharging the guardian

-36-

ad litem under R.C. 2151.281(D). As the basis for their claim, Appellants assert that the guardian ad litem did not fulfill his duty to conduct an independent investigation and review, and did not comply with the guidelines in Sup.R. 48.

{¶71} Section 2151.281(I) of the Revised Code requires a guardian ad litem in a permanent custody case to: "perform whatever functions * * * necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child * * *." *Id.*

{¶72} In this case, the guardian ad litem filed his report on December 7, 2015, the first day of the permanent custody hearing. On the last day of the permanent custody hearing, the guardian ad litem was called to the stand on cross-examination. Prior to the guardian ad litem testifying, trial counsel for Mother made an oral motion to strike the guardian ad litem's report on the basis that it did not constitute a "final report" because the guardian ad litem failed to specify "permanent custody" when he recommended that the Agency "be awarded custody" of the children in his report. The trial court overruled counsel's motion, noting that the guardian ad litem was about to take the stand and could clarify or update his recommendation for the parties if necessary.

**{¶73}** The guardian ad litem's testimony reveals that he twice visited Appellants' home and noted no significant improvement in the condition, observed the children to be well-adjusted in their foster care placements less than one month prior to the permanent custody hearing, attended all necessary hearings and court proceedings, interacted with Appellants in the courtroom and twice outside the court proceedings, and reviewed pertinent Agency documents and conferred with the Agency's caseworker. He expressed his reason for recommending the trial court grant the Agency's motion for permanent custody was primarily based upon the parents having had ample opportunity to either remedy the cause for the children's removal by making the home suitable for the children's return or to be willing to seek alternative housing, but that Appellants failed to do so in the two-and-a-half year period.

**{¶74}** Appellants claim that the guardian ad litem failed to comply with the guidelines stated in Sup. R. 48(D). Specifically, Appellants argue that the guardian ad litem failed to fulfill the minimum responsibilities set forth in Sup.R. 48(D)(13), which states:

> **(13) A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties. In order to provide the court with relevant information and an informed recommendation as to the child's best interest, a guardian ad litem shall, at a minimum, do the following, unless impracticable or inadvisable because of the age of the child or the specific circumstances of a particular case:**

**(a)   Meet with and interview the child and observe the child with each parent, foster parent, guardian or physical custodian and conduct at least one interview with the child where none of these individuals is present;**

**(b)   Visit the child at his or her residence in accordance with any standards established by the court in which the guardian ad litem is appointed;**

**(c)   Ascertain the wishes of the child;**

**(d)   Meet with and interview the parties, foster parents and other significant individuals who may have relevant knowledge regarding the issues of the case;**

**(e)   Review pleadings and other relevant court documents in the case in which the guardian ad litem is appointed;**

**(f)   Review criminal, civil, educational and administrative records pertaining to the child and, if appropriate, to the child's family or to other parties in the case;**

**(g)   Interview school personnel, medical and mental health providers, child protective services workers and relevant court personnel and obtain copies of relevant records;**

**(h) Recommend that the court order psychological evaluations, mental health and/or substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court; and**

**(i)   Perform any other investigation necessary to make an informed recommendation regarding the best interest of the child.**

**{¶75}** The record establishes that the guardian ad litem complied with many

of these guidelines.  Appellants appear to take issue with the fact that the guardian

ad litem never observed them interact with the children. However, as previously noted, Appellants attended only a small portion of the scheduled visitations over a two-and-half-year period. Appellants also claim that the two times the guardian ad litem visited their home were inadequate given the fact that the condition of the home was such an important aspect of this case. We find this argument highly speculative on Appellants' part that an increase of the guardian ad litem's visits to their home would have made a difference in the overall outcome in this case given the fact that over a year into the Agency's involvement Appellants refused to let the Agency's caseworker or the county code enforcement officer into the home.

{¶76} Further, there is no indication in the record that Appellants would have treated the guardian ad litem differently and welcomed him into the home to view the conditions. Moreover, the record suggests that due to the Appellants' failure to permit an inspection of the home—by either the caseworker or the health department, there was no opportunity for the conditions of the home to be viewed to ensure the children's safety if returned. To the contrary, the uncontroverted evidence in the record suggests that the conditions of the home had not improved, but were again deteriorating.

{¶77} Even if the guardian ad litem failed to sufficiently comply with Sup.R. 48, several appellate districts have previously held that Sup.R. 48 does not create substantive rights. *In re E. W.*, 4th Dist. Washington No. 10CA18, 10CA19,

10CA20, 2011-Ohio-2123, ¶ 12; accord *In re J.A. W.*, 11th Dist. Trumbull No.2013-T-0009, 2013-Ohio-2614, ¶ 47; *In re K. V.*, 6th Dist. Lucas No. L-11-1087, 2012-Ohio-190, ¶ 30 (stating that the Rules of Superintendence do not give rise to substantive rights, and so the filing of a guardian ad litem's report is not mandatory.). " 'They are not the equivalent of rules of procedure and have no force equivalent to a statute. They are purely internal housekeeping rules which are of concern to the judges of the several courts but create no rights in individual defendants.' " *Allen v. Allen*, 11th Dist. Trumbull No.2009-T-0070, 2010-Ohio-475, ¶ 31, quoting *State v. Gettys*, 49 Ohio App.2d 241, 243, (3d. Dist. 1976).

{¶78} Appellants also specifically assert that the trial court is precluded from considering the guardian ad litem's recommendation because his determination regarding the maturity level of the eight-year-old's and seven-year-old's ability to express their wishes was unsubstantiated. Even assuming *arguendo* that the guardian ad litem was mistaken in his assessment, Appellants cannot demonstrate that any error relating to the guardian ad litem's failure to ascertain the specific wishes of the two eldest children affected the outcome of the proceedings. *See In re N.G.*, 9th Dist. No. 12CA010143, 2012-Ohio-2825, ¶ 28 (holding that the absence of evidence of child's wishes was not reversible error in the permanent custody appeal because there was substantial evidence on the remaining mandatory factors and the guardian ad litem had investigated the case and had given a report to the

trial court about the child's best interests). Here, the considerations attendant to Appellants' failure to remedy the conditions of the home—which implicated serious health and safety concerns—and their lack of commitment toward the children during the case by failing to regularly attend visitations were paramount to any potential desire expressed by the oldest children to return to Appellants' home.

**{¶79}** It is worth noting that a number of courts have determined that when parents cannot establish any prejudice arising from the action or non-action of a guardian ad litem, it is harmless error. *See*, *In re Sanders Children*, 5th Dist. Tuscarawas No. 2004 AP 08 0057, 2004-Ohio-5878, ¶ 76; *see also In re West*, 4th Dist. Athens No. 05CA4, 2005-Ohio-2977, ¶ 27 (concluding that mother could not establish prejudice when mother did not show what other evidence the guardian ad litem could have discovered that may have affected the guardian's recommendation); *In re Seitz*, 11th Dist. Trumbull No.2002-T-97, 2003-Ohio-5218, ¶ 29 ("[I]t is not immediately apparent that a custodial disposition should be reversed on the basis of arguably ineffective service by the guardian ad litem."); *In re E.M.*, 8th Dist. Cuyahoga No. 79249 (Nov. 8, 2001) (" ' * * * [W]hen parents cannot establish prejudice arising from the misfeasance, or nonfeasance, of a guardian ad litem, it is harmless error.' "), quoting *In re Breslav*, 8th Dist. Cuyahoga No. 75468 (Apr. 13, 2000); *In re J.C.*, 4th Dist. Adams No. 07CA833, 2007-Ohio-

3781, ¶ 14 (determining that any error associated with guardian ad litem's failure to interview children of tender years did not affect the outcome of the proceeding).

**{¶80}** Moreover, it is important to recognize that a trial court is not bound by the recommendation of the guardian ad litem. *In re M.Z.*, 9th Dist. Lorain No. 11CA010104, 2012-Ohio-3194, ¶ 35; *In re Andrew B*., 6th Dist. Lucas No. L01-1440, 2002-Ohio-3977, at ¶ 64; *Roberts v. McGrady*, 9th Dist. Summit No. 16986, at *4 (May 10, 1995) (concluding that because a guardian ad litem's report is not dispositive, but merely evidence for the court's consideration, any unfair bias was harmless error). The trial court determines a guardian ad litem's credibility and the weight to be given to his/her report. The trial judge, as trier of fact, was entitled to believe or disbelieve the guardian ad litem's testimony and to consider it in the context of all the evidence before the court. Also of note, counsel for Appellants questioned the guardian ad litem, and addressed specific questions regarding his investigation and the basis of his report at the permanent custody hearing. Appellants have failed to point to any portion of the judgment entries that demonstrates that the trial judge erroneously relied on the testimony or the report of the guardian ad litem. Nor do they point to any particular finding that is unreasonable or otherwise unsupported by the evidence because of improper reliance on the testimony of the guardian ad litem.

**{¶81}** Based upon our prior discussion of the facts and circumstances in this case establishing the overwhelming evidence that Appellants' failed to remedy the abhorrent conditions of the home, which caused the children's initial removal, and their failure to regularly exercise visitation with the children or to follow the directives in the Agency's case plan, Appellants cannot show that any alleged deficiency in the guardian ad litem's performance affected the outcome of these proceedings. Thus, we find no grounds for reversal due to the trial court's consideration of the guardian ad litem's report, testimony, and recommendation. Accordingly, Mother's second assignment of error and Father's first and second assignments of error are overruled.

**{¶82}** For all these reasons, Mother's and Father's assignments of error are overruled and the judgments are affirmed.

*Judgments Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**